UNITED STATES of America,
Appellant,

v.

Jerrell HEATH, Defendant–Appellee.

Docket No. 04–4599–CR.

United States Court of Appeals,
Second Circuit.

Argued: April 7, 2005.

Decided: July 10, 2006.

Bradley E. Tyler, Assistant United States Attorney, for Michael A. Battle, United States Attorney for the Western District of New York, Rochester, NY, for the Appellant.

Robert G. Smith, Assistant Federal Public Defender (Jay S. Ovsiovitch, of counsel), Rochester, NY, for the Defendant–Appellee.

Before CALABRESI and CABRANES, Circuit Judges, and HALL, District Judge.*

Judge JOSÉ A. CABRANES filed a separate opinion, concurring in part and dissenting in part.

Judge JANET C. HALL filed a separate opinion, concurring in part and dissenting in part.

CALABRESI, Circuit Judge, delivering the majority opinion with respect to Part II, in which CABRANES, Circuit Judge, joins, and the majority opinion with respect to Part III, in which HALL, District Judge, joins.

I.

Sometime in the early afternoon of November 8, 2003, local law enforcement officials executed a search warrant at 205 Glenwood Avenue in Rochester, New York ("the Glenwood residence"). The warrant, which had issued on the basis of reports by two confidential informants that they had separately bought dime bags of cocaine from persons at that address, authorized a no-knock entry and search of the Glenwood residence for cocaine, for records showing the sale and trafficking of cocaine, for proceeds from such sales, and for documents indicating the occupancy, residency and/or ownership of the premises. The warrant did not, however, authorize any arrests, nor was there evidence suggesting the involvement of any specific individuals.

Lieutenant Eric Paul ("Paul") of the Rochester Police Department was one of the first law enforcement officials to enter the Glenwood residence.[1] Upon entering

---

* The Honorable Janet C. Hall, United States District Court for the District of Connecticut, sitting by designation.

1. Paul was the only witness to testify at the suppression hearing. The account of the search and of Heath's arrest is based entirely on Paul's undisputed testimony.

the residence, Paul observed Lionel Summersett ("Summersett") step out of the bathroom at the top of the home's stairwell. From the bottom of the stairs, Paul ordered Summersett to lie on the floor. With gun drawn, Paul held Summersett in that position until the other officers completed an initial safety sweep of the home's ground floor.[2]

Paul then went up the stairs. While other officers took Summersett into custody, Paul went into the upstairs bedroom closest to the stairwell. There he found defendant-appellee Jerrell Heath ("Heath") sitting on the bed, talking on a cell phone. Paul placed Heath in handcuffs, ordered him to lie on a pile of clothes, and pat-frisked him. The frisk revealed nothing incriminating. Paul and other officers then searched the bedroom. Behind a dresser, concealed from plain view, Paul discovered a small bag with one-half ounce of marijuana. The dresser was approximately five feet from where Heath was found sitting on the bed talking on the phone.

Once Paul discovered the marijuana, other members of the Rochester Police Department took Heath from the bedroom and formally arrested him. A search attendant to that arrest revealed that Heath had $3,073 in cash.

While Heath was being arrested in the hallway, Paul continued to search the bedroom and discovered a loaded 9mm handgun in the top dresser drawer. Paul then left the bedroom and was informed that other officers had found several small bags of cocaine in plain view in the residence.

Ultimately, Heath was charged with the following offenses: possession of a firearm in furtherance of drug trafficking, in violation of 18 U.S.C. § 924(c)(1)(A); being a felon in possession of a firearm, in violation of 18 U.S.C. 922(g)(1); possession of marijuana, in violation of 21 U.S.C. § 844; and possession of cocaine base with intent to distribute, in violation of 21 U.S.C. § 841(a)(1). Thereafter, in proceedings before Magistrate Judge Marian W. Payson, Heath argued that he had been arrested without probable cause, and moved to suppress the seized currency. In due course, the magistrate judge issued a report recommending that, because the only evidence linking Heath to the marijuana was his proximity to that hidden contraband, the police lacked probable cause for his arrest. The magistrate judge based this conclusion on three Fourth Amendment cases discussing "premises" and "proximity" liability: *United States v. Di Re*, 332 U.S. 581, 68 S.Ct. 222, 92 L.Ed. 210 (1948), *Sibron v. New York*, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968), and *Ybarra v. Illinois*, 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979). The magistrate judge further held that the Supreme Court's recent decision in *Maryland v. Pringle*, 540 U.S. 366, 124 S.Ct. 795, 157 L.Ed.2d 769 (2003), did not justify Heath's arrest, as Heath was arrested in a "fixed residence," not in an automobile. Finally, the magistrate judge determined that the currency found on Heath's person was not admissible under the "inevitable discovery" doctrine.

The district court (Telesca, *J.*) agreed with the magistrate judge's recommendation and ordered that the evidence found on Heath be suppressed. In so doing, the district court declared its unwillingness to extend *Pringle* to the situation in this case, because "Fourth Amendment jurisprudence recognizes a distinct difference between a passenger in an automobile and an occupant of a fixed premises."

---

**2.** The initial downstairs sweep revealed two children.

In this interlocutory appeal, the government argues that the district court erred by suppressing the evidence. We need not, at this time, address the government's primary contention on appeal—that Heath's arrest was constitutional under *Pringle*—because, assuming *arguendo* that Heath was arrested without probable cause, we find that the evidence at issue may well have been admissible under the inevitable discovery doctrine, notwithstanding the putative Fourth Amendment violation. In so doing, we emphasize that the inevitable discovery doctrine is available only where there is a high level of confidence that each of the contingencies required for the discovery of the disputed evidence would in fact have occurred. In circumstances such as those before us, where the government contends that the challenged evidence would inevitably have been discovered during a search incident to a valid arrest, one of the contingencies that must be resolved in the government's favor involves a police officer's discretionary decision to arrest and search the person on whom the evidence would presumably have been found.

On the record before us, we believe that the district court erred in reaching a firm conclusion that the currency seized on Heath's person would not have been inevitably discovered, and we conclude that further consideration of that issue is needed. At the moment of Heath's arrest, Paul and the arresting officers knew only that Heath was in the same room as a small, concealed quantity of narcotics. Even if this was not an adequate basis upon which to arrest him—and we assume, *arguendo,* that it was not—a sufficient reason to justify the arrest and a search attendant to the arrest arguably became evident a few moments later. But whether the relevant officers would have acted on that reason, and would then have arrested Heath, thereby bringing the inevitable discovery doctrine into play, is not clear to us. Nor do we have findings by the district court on the matter. We therefore remand the case for further findings.

\* \* \*

■ Under the "inevitable discovery" doctrine, evidence obtained during the course of an unreasonable search and seizure should not be excluded "if the government can prove that the evidence would have been obtained inevitably" without the constitutional violation. *Nix v. Williams,* 467 U.S. 431, 447, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984); *see also United States v. Eng,* 997 F.2d 987, 990 (2d Cir.1993) (inevitable discovery doctrine "requires the district court to determine, viewing affairs as they existed at the instant before the unlawful search, what *would have happened* had the unlawful search never occurred" (emphasis in original) (internal quotation marks omitted)). In essence, the inevitable discovery doctrine's application turns on a central question: Would the disputed evidence inevitably have been found through legal means "but for" the constitutional violation? If the answer is "yes," the evidence seized will not be excluded. In the case before us, this inquiry requires the government to prove: (a) that law enforcement officers *could have* validly arrested Heath on the basis of evidence that became available moments after Heath was (arguably improperly) arrested, and (b) that law enforcement officers would have acted on that evidence and, given the circumstances, *would have* arrested Heath. That is, the currency should not be excluded if there is sufficient proof that a later arrest was valid and sufficiently likely to occur as to qualify as "inevitable."

## II. Validity of a Later Arrest

■ The arguably valid reason for a later arrest, and hence for inevitable dis-

covery, came about in the following way. As soon as Paul emerged from the bedroom, he learned that other officers had discovered several "loose dime bags of crack cocaine" on the landing of the stairwell, on the stairwell itself, *and at the bottom of the stairwell.* At that point, Paul observed what appeared to be small bags of cocaine in plain view in each of these locations. Three of the small bags of cocaine were at the bottom of the stairs. The magistrate judge determined that Summersett must have dropped the bags of cocaine on the stairwell and on the landing (which were found underneath or around Summersett) when Paul initially commanded him to lie down. The magistrate judge's factual finding—that the "logical inference" to be drawn from the circumstances was that the cocaine found underneath or immediately around Summersett was dropped by him upon exiting

the bathroom—was not clearly erroneous. And so we cannot say that the cocaine assertedly dropped by Summersett created probable cause to arrest Heath, because these facts would not, in and of themselves, lead a "person of reasonable caution," *United States v. Rogers,* 129 F.3d 76, 79 (2d Cir.1997), to believe that Heath was complicit in Summersett's apparent possession of the cocaine found on the stairwell and on the landing.

But neither the magistrate judge nor the district court reached any similar conclusion as to the origin of the cocaine in plain view at the *bottom* of the stairwell. While the magistrate judge noted that the "logical inference" was that the cocaine *on the stairwell,* and *on the landing,* was dropped by Summersett "on his way to or from the bathroom," no such finding was made regarding the origin of the cocaine *at the bottom* of the stairwell.[3] Similarly,

3. The magistrate judge did state, in a general comment about the bags of cocaine found throughout the Glenwood residence, that "the record ... does not indicate whether Summersett dropped the bags on his way to or from the bathroom or when he was ordered to lie down on the stairwell, or whether they were recovered during the officers' search of him." There is nothing in the record currently before us, however, that supports the position that these three possibilities were the *only* ways in which the cocaine could have found its way to the bottom of the stairs. We do not know whether the magistrate judge's list of possible origins of the found drugs was meant to be exclusive. But if it was, that finding would be clearly erroneous. *See, e.g., Krizek v. Cigna Group Ins.,* 345 F.3d 91, 100 (2d Cir.2003) (recognizing that factual findings were clearly erroneous where the "record before the court [was] simply devoid of any basis for the [district] court's conclusion").

It is possible to read the magistrate judge's order, and Paul's testimony, as asserting that cocaine was found in only *two* locations—the top of the stairwell (which, on this reading, includes the landing), and at the *bottom* of the stairwell. While we do not read the record in this fashion, we note that even if the cocaine

at issue were found in just two locations, the magistrate judge's findings still would not appear to address the origin of the cocaine at the bottom of the stairwell.

The court's statement that "the logical inference, it seems to me, is that [the bags of cocaine] fell from Summersett on his way to or from the bathroom," is best read as a statement that the bags of cocaine at the top of the stairwell were dropped during Summersett's exit from the upstairs bathroom. There is nothing in the record as we have it at this time to support the "inference" that Summersett, while held at gunpoint and observed by Paul, or once taken into custody by the other agents, somehow managed, undetected, to throw several bags of cocaine onto the floor of the apartment at the bottom of the stairwell. Accordingly, any finding that that is how the bags of cocaine got there would, on the existing record, be clear error. On the basis of the facts presently in the record, we, and the magistrate judge, can conclude no more than that the bags of cocaine were at the bottom of the stairwell, and were there in plain view, when Paul observed them. Our factual perspective at this juncture—in which we review ambiguities in the light most favorable to Heath, the prevailing party below, *see*

although the district court's order noted that the government's evidence did not establish that Heath had *actually seen* narcotics (or firearms) anywhere in the house prior to the officers' entry into the residence, the district court did not, at any point, make specific findings on this question.

Viewing the facts in the light most favorable to the prevailing party (here, Heath), *see United States v. Harrell*, 268 F.3d 141, 145 (2d Cir.2001), we cannot say that Heath actually saw the cocaine on the stairwell, on the landing, or at the bottom of the stairwell before he entered the bedroom and began to speak on the cell phone. Still, undisputed evidence indicates that the bags of cocaine at the *bottom* of the stairs were in plain sight when the officers discovered them. And a reasonable officer could, therefore, conclude that the bags at the bottom of the stairs were likely to have been there prior to the arrival of law enforcement officials at the Glenwood residence.

Under the circumstances, whether Heath actually saw the bags of cocaine at the bottom of the stairs before the police entered the Glenwood residence is of no import. He could see them, and in fact would be expected to see them, in the regular course of walking through the small home's public spaces. As a result, a "person of reasonable caution," *Rogers*, 129 F.3d at 79, could properly have concluded that Heath had committed or was committing a crime. After all, those who are permitted to observe obvious criminal activity in a home are, absent indications to the contrary, likely to be complicit in the offense. *See, e.g., United States v. Pennington*, 287 F.3d 739, 747 (8th Cir. 2002) ("Having entered the residence lawfully, the officers could act upon the drug

manufacturing evidence in plain view. That evidence provided probable cause to arrest [the occupant of the apartment], which justified a search of his person incident to the arrest.") (internal citation omitted); *United States v. Jones*, 72 F.3d 1324, 1332–33 (7th Cir.1995) (concluding that probable cause existed based on defendant's "evident status as a resident of a private household in which counterfeit money was being sold on a regular basis and in which *the evidence of counterfeiting lay in plain view*" (emphasis added)); *United States v. Holder*, 990 F.2d 1327, 1329 (D.C.Cir.1993) (holding that keeping narcotics "openly on display" in a private residence was indicative that the residence's owner considered a visitor "sufficiently complicit to allow him a full view"); *Hollyfield v. United States*, 407 F.2d 1326, 1326 (9th Cir.1969) (holding that visible contraband in plain view within the apartment provided probable cause for an arrest of person found therein); *cf. United States v. MacDonald*, 916 F.2d 766, 768, 770 (2d Cir.1990) (holding that undercover agent's observation of cocaine and marijuana in plain view throughout an apartment containing six men provided probable cause to arrest all six occupants).

In the case before us, there is no evidence that any precautions were taken to prevent people in the house from coming across the putatively visible contraband, and from doing so in the ordinary course of their expected behavior. As a result, reasonably cautious police officers could have concluded that the home's adult occupants were complicit in the illegal activities involving the contraband. It follows that the law enforcement officials seemingly had a valid ground for arresting both of the adult occupants of the Glenwood resi-

*United States v. Harrell*, 268 F.3d 141, 145 (2d Cir.2001)—does nothing to change this. For,

as we have said, there is currently no evidence in the record that creates an ambiguity.

dence.[4] And, accordingly, we conclude that Heath's arrest, though effectuated in quick order and arguably prematurely, might well have validly occurred in an appropriate manner as soon as the plainly visible contraband came to the attention of the arresting officers.[5]

## III. Inevitability of a Later Arrest

In cases where the government argues that disputed evidence would inevitably have been discovered during a search incident to arrest, the government must establish that the arrest would have been valid. But, evidence that an arrest would have been supported by probable cause and, therefore, could legally have taken place, only makes the inevitable discovery doctrine potentially applicable. That is, to find that reasonable police officers could properly believe that they had probable cause to arrest Heath shortly after they, seemingly improperly, arrested him does not mean that they would inevitably have done so at the later time. The circumstances of this case force us to focus on the possible gap between, on the one hand, facts that are sufficient to qualify as probable cause and thereby enough to validate an arrest, and, on the other hand, facts that are sufficient to establish that a legal arrest and subsequent search would inevitably have taken place very soon after the arguably unconstitutional arrest. Even if the present record provides enough evidence to suggest that a reasonable police officer *could have* made a valid arrest supported by probable cause, it does not establish with a sufficiently high degree of certainty that a reasonable police officer *would have* made the arrest under the circumstances. Because we cannot, on the record before us, resolve this latter contingency, we cannot at this time decide whether Paul and his fellow officers would in fact have discovered the currency whose exclusion is at issue in this case. We therefore remand the case for more findings.

■ We have previously indicated that the government cannot prevail under the inevitable discovery doctrine merely by establishing that it is more probable than not that the disputed evidence would have been obtained without the constitutional violation.[6] *See United States v. Cabassa,*

4. Heath cannot be said to have *actually* seen the cocaine at the bottom of the stairs on his way to the upstairs bedroom. But, as we have already said, evidence demonstrating Heath's actual observation of the contraband was not necessary to create probable cause for the arrest. What mattered was that contraband was left openly, in a public space, so that a reasonably cautious person could easily conclude that guests and residents of the home were highly likely to see the contraband in the ordinary course.

The presence of *any* quantity of narcotics (or related contraband) in plain view in *any* location in a home does not, automatically, create probable cause to arrest *every* person present in that home. We need not, and do not, today decide exactly what limitations the Fourth Amendment would place on such arrests. For present purposes, we need only recognize that Heath—one of only two adults

inside a small home containing, in a highly public and common space, a relatively large quantity of drugs—could reasonably be seized by the arresting officers.

5. We find nothing to the contrary in *Ybarra, Sibron,* or *Di Re,* which all dealt with conduct that was, on its face, innocent. *See Ybarra,* 444 U.S. at 88, 100 S.Ct. 338; *Sibron,* 392 U.S. at 45, 88 S.Ct. 1889; *Di Re,* 332 U.S. at 593, 68 S.Ct. 222.

6. This requirement of certitude should not be confused with the government's burden of proof, which, it is well settled, requires that inevitable discovery be established by a preponderance of the evidence. *See Nix,* 467 U.S. at 444, 104 S.Ct. 2501 ("If the prosecution can establish by a *preponderance of the evidence* that the information ultimately or inevitably would have been discovered by lawful means ... then the deterrence ratio-

62 F.3d 470, 472–73 (2d Cir.1995). On the contrary, we held in *Cabassa* that proving that a judge *could* validly have issued a warrant supported by probable cause was not necessarily enough to establish that a judge *would* have issued the warrant in question. *See id.* at 474. In that case, agents from the Drug Enforcement Agency ("DEA") entered the defendant's home and seized controlled substances, weapons, and money, all without a warrant. *See id.* at 472. At the time of the search, other DEA agents were in the process of requesting, but had not obtained, a warrant from a magistrate judge. *Id.* Rejecting the district court's conclusion that the contraband would inevitably have been found because a warrant would surely have been issued, we suppressed the illegally-acquired evidence on the grounds that the magistrate judge might not have granted a warrant to conduct the search. We did so even though we conceded that the district court might well have been correct that the "government's draft affidavit demonstrated probable cause" to support the issuance of a warrant. *See id.* at 473. But,

because there was "some room for disagreement," we found "a residual possibility that a magistrate judge would have required a stronger showing of probable cause" before authorizing the search and seizure. *Id.* at 473–74. Since this eventuality could not be resolved in the government's favor, we declared the evidence inadmissible. *Id.*

Our decision in *Cabassa* established that evidence minimally sufficient to support probable cause would not always be enough to demonstrate that a governmental actor vested with discretion—*e.g.*, a magistrate judge asked to issue a warrant—would act on that evidence.[7] On the basis of *Cabassa*, district courts in our circuit have held that the inevitable discovery exception to the exclusionary rule is available only where a court has a "high level of confidence" that "each of the contingencies" needed to obtain the evidence legally would be resolved in the government's favor:

> The teaching of *Cabassa*, which is supported by principles of probability, thus is straightforward. It suggests that a

---

nale has so little basis that the evidence should be received." (emphasis added)); *see also United States v. Cunningham*, 413 F.3d 1199, 1203 (10th Cir.2005) ("The government possesses the burden of proving by a preponderance of the evidence that the evidence at issue would have been discovered without the Fourth Amendment violation.").

In adopting this standard, we have acknowledged, but have failed to resolve, the paradox of applying the preponderance of the evidence standard in the context of inevitable discovery: "There are, of course, semantic problems in using the preponderance of the evidence standard to prove inevitability.... Given the present facts, we need not probe further into the semantic puzzle other than to note the difference between proving by a preponderance that something *would have happened* and proving by a preponderance that something *would inevitably have happened*." *United States v. Cabassa*, 62 F.3d 470, 474 (2d Cir.1995) (emphasis added). Because further clarification is not needed to resolve the case

before us, we leave to another day the task of ironing out this wrinkle in the doctrine.

7. In *Cabassa*, we distinguished an earlier inevitable discovery case, *United States v. Whitehorn*, 829 F.2d 1225 (2d Cir.1987), on the grounds that, in *Whitehorn*, there had been " 'overwhelming' probable cause to support the warrant application," which strengthened the government's contention in that case that the issuance of a valid warrant was, under the circumstances, truly inevitable. *See Cabassa*, 62 F.3d at 473 (emphasis added). Accordingly, at least with respect to a judge's decision to issue a warrant, *Cabassa* could be read to require "overwhelming probable cause" to demonstrate inevitable discovery. *Cabassa's* reasoning, however, only establishes that (absent indications to the contrary) overwhelming probable cause is sufficient to find inevitable discovery, not that it is necessary to reach such a conclusion.

trial court's task in [the] context [of inevitable discovery] is to deny the motion to suppress on the ground of inevitable discovery only if it has a *high level of confidence* that the warrant in fact would have issued and that the specific evidence in question would have been obtained by lawful means. Inevitable discovery analysis therefore requires a court to examine *each of the contingencies* that would have had to have been resolved favorably to the government in order for the evidence to have been discovered legally and to assess the probability of that having occurred.

*United States v. Lavan*, 10 F.Supp.2d 377, 389 (S.D.N.Y.1998) (Kaplan, *J.*) (emphasis added); *see also United States v. Arms*, 2002 WL 32781, *5 (E.D.N.Y.2002) (Block, *J.*) (finding that discovery of the evidence was inevitable when there is "no question that a warrant would in fact have issued").

The Tenth Circuit has similarly required substantial certainty with respect to each of the contingencies involved in the causal chain of inevitability posited by the government. *See United States v. Cunningham*, 413 F.3d 1199, 1203 (10th Cir.2005) ("[W]e held it permissible for a court to apply the inevitable discovery doctrine when it has a high level of confidence that the warrant in fact would have been issued and that the specific evidence in question would have been obtained by lawful means. Inevitable discovery analysis thus requires the court to examine each of the contingencies involved that would have had to have been resolved favorably to the government in order for the evidence to have been discovered legally and to assess the probability of the contingencies having occurred." (internal quotation marks and citation omitted)). *See also United States v. Romero*, 692 F.2d 699, 704 (10th Cir.1982) ("Under the inevitable discovery exception, unlawfully seized evidence is admissible if there is *no doubt* that the police would

have lawfully discovered the evidence later." (emphasis added)).

In contrast, other circuits have required only that there be a "reasonable probability that the contested evidence would have been discovered by lawful means in the absence of the police misconduct." *United States v. Chambers*, 132 Fed.Appx. 25, 33 (5th Cir.2005); *see also Jefferson v. Fountain*, 382 F.3d 1286, 1296 (11th Cir.2004); *United States v. James*, 353 F.3d 606, 617 (8th Cir.2003); *United States v. Kennedy*, 61 F.3d 494, 499 (6th Cir.1995); *United States v. Thomas*, 955 F.2d 207, 210 (4th Cir.1992). And before our decision in *Cabassa*, two district courts of this circuit also used the "reasonable probability" threshold. *See United States v. Yanes*, 671 F.Supp. 927, 933 (D.Conn.1987) (Dorsey, *J.*); *United States v. Levasseur*, 620 F.Supp. 624, 631 (S.D.N.Y.1985) (Glasser, *J.*).

■ To the extent that any confusion lingers in our circuit after *Cabassa*, we now expressly eschew the "reasonable probability" framework that some of our sister circuits have used to analyze "inevitable discovery" cases. In its place—and consonant with the "teachings of *Cabassa*," with the Tenth Circuit's methodology in *Cunningham*, and with the approach most recently taken by our district courts—we conclude that illegally-obtained evidence will be admissible under the inevitable discovery exception to the exclusionary rule only where a court can find, with a high level of confidence, that each of the contingencies necessary to the legal discovery of the contested evidence would be resolved in the government's favor.

■ Applying this analysis to the instant case, the issue becomes: can we conclude, with sufficient confidence, that law enforcement officers—assuming that they were legally entitled to arrest Heath—would have done so under the cir-

cumstances? For the purposes of this inquiry, we apply *Cabassa's* reasoning—which analyzed a judge's discretionary decision to grant a search warrant—to a police officer's discretionary decision to make an arrest.[8] With respect to such a decision by a police officer, we hold that relatively weak evidence of the right to arrest is not sufficient, without further findings, to establish that an officer would, in fact, have made an arrest. To hold otherwise would undermine the discretion we give to police officers to decide—on the basis of police protocol, of the circumstances confronting them, and of their trained judgment—whether and in what cases they should use their power to arrest.[9]

For some circuits, evaluating a police officer's discretionary decision to arrest as part of the inevitable discovery analysis is nothing new. Although, in the decisions we have found, this evaluation resulted in the admission of the evidence, in various key cases, the evidence was admitted only after an express determination that an arrest would, in fact, have occurred. And, the validity of the arrest seemed to be a necessary, but not sufficient, condition for the application of the inevitable discovery rule. Thus, in *United States v. Cherry*, 759 F.2d 1196 (5th Cir.1985), the Fifth Circuit admitted contested fingerprint evidence after explicitly agreeing with the district court's conclusion "that [the defendant] eventually *would have been* lawfully arrested and fingerprinted." *Id.* at 1208 (emphasis added).[10] Similarly, in *United States v. White*, 326 F.3d 1135 (10th Cir.

8. Lending support to the proposition that the discretionary decisions of police officers qualify as "one of the contingencies" necessary to establish inevitable discovery, the First Circuit has intimated that courts should examine a police officer's decision to seek a warrant in the first place, not just the judge's decision to grant one, in evaluating a claim of inevitable discovery. *See United States v. Silvestri*, 787 F.2d 736, 745 (1st Cir.1986) ("[T]he requirement of active pursuit could be viewed as ensuring the independent inevitability of the police decision to seek the search warrant, *i.e.*, to ensure that the evidence turned up in the illegal search did not influence this decision.").

9. In *Wayne v. United States*, 318 F.2d 205 (D.C.Cir.1963), then-Judge Warren Burger justified the admission of testimony, which was originally taken from a coroner after an illegal search uncovered a dead body, on the grounds that the coroner's testimony would inevitably have materialized: "It was inevitable that, even had the police not entered appellant's apartment at the time and in the manner they did, the coroner would sooner or later have been advised by the police of the information reported by the [decedent's sister], would have obtained the body, and would have conducted the post mortem examination prescribed by law." *Wayne*, 318 F.2d at 209. Importantly, to support this conclu-

sion, Burger cited police regulations requiring officers to contact a coroner after finding a dead body, as well as a local law mandating that the coroner conduct an autopsy. *See id.*

We too have looked to internal police practices to determine whether a police officer's decision was, in fact, inevitable. *See, e.g., United States v. Mendez*, 315 F.3d 132, 138 (2d Cir.2002) (applying the inevitable discovery exception in part because "[t]he record amply supports the district court's conclusion that that [the police department] had a consistent, if unwritten, inventory search policy," which would have led to the evidence notwithstanding the earlier invalid search).

Accordingly, evidence that proper police protocol would have required Heath's arrest would certainly bear on whether the arrest was in fact inevitable. Conversely, the absence of such guidelines might perhaps suggest that the officers would not necessarily have arrested Heath, and hence that the currency would not inevitably have been found. These are precisely the type of considerations that are suitable for review on remand.

10. To justify this conclusion, the *Cherry* court listed the considerable evidence in support of the government's position that an arrest *both* would have been supported by probable cause *and* would have inevitably happened:

By the time [the defendant] was brought before a magistrate, the FBI agents had

2003), the Tenth Circuit permitted evidence that purportedly would have been found during a lawful arrest only after deciding: (a) that a background check would inevitably have been conducted, and (b) that "ample evidence support[ed] the conclusion that, once the [background] check revealed [the defendant's] outstanding warrant, [the defendant] *would have been* lawfully arrested ..." *Id.* at 1139 (emphasis added). Hence, in both *Cherry* and *White*, the circuit court accepted the government's argument that the disputed evidence would inevitably have been found during an arrest, but did so after making specific findings, based on a careful examination of the record, not just that the contingent arrest was proper, but also, and importantly, that the arrest was inevitable.[11]

In contrast, in the circumstances of this case, it is possible that an arrest, even if potentially valid, would not have been made. And if no such arrest would have been made, then there would have been no inevitable discovery, and, hence, the currency at issue would be properly excluded. It is, of course, also possible that the arrest and discovery of the cash would have occurred. But, on the record before us and without further findings by the court below, we cannot say whether the likelihood of such an arrest was great enough to justify the application of the doctrine of inevitable discovery.[12]

Because we cannot at this time and on this record know whether inevitable discovery would have occurred, we cannot decide whether the district court's exclusion of the currency at issue was correct. Accordingly, we VACATE the order of the district court and REMAND for further proceedings consistent with this opinion.

---

uncovered the following facts independently of prior misconduct: (1) [the defendant's] military identification and driver's license was in the victim's abandoned taxicab; (2) the taxicab's last dispatch was to [the defendant's] barracks at Fort Bliss; (3) the victim's wallet had been left in a trash receptacle in the latrine area in [the defendant's] barracks; and (4) members of [the defendant's] unit had seen him recently in possession of a .32 caliber pistol. We think that the laminated total of this information amounts to probable cause *and that the district court's finding that the agents eventually would have acted upon the probable cause to arrest [the defendant] is not clearly erroneous.*
*Cherry,* 759 F.2d at 1208 n. 16 (emphasis added).

11. We do not mean to suggest that such an examination is needed in every case. There obviously will be some in which the inevitability of the arrest is sufficiently obvious as not to require discussion. But, as *Cherry* and *White* demonstrate, there clearly are others in which a careful review of the record is essential. And, in such cases, where it is possible, this type of parsing of record evidence is best done, in the first instance, by the district court.

12. A remand is not rendered futile either by the fact that Heath was actually arrested, or by the possibility that the police officers might testify, on remand, that they would have arrested Heath under circumstances of this case. An officer's isolated statement that an arrest would have occurred (which we do not have on the record before us)—even if seemingly buttressed, as it would be in the instant case, by the fact that the defendant was, in reality, illegally arrested—would not, by itself, be enough to satisfy the government's burden to establish that the arrest was inevitable. We noted in *Eng,* after all, that an officer's testimony "as to what he would have done or how he would have behaved, while deserving of careful consideration as part of the analysis, is not necessarily conclusive on the question of whether a particular piece of evidence inevitably would have been found through lawful means." *Eng,* 971 F.2d at 862. The question is whether an officer would have "inevitably" acted in a certain way, and that inquiry remains an objective one, not necessarily turning on an officer's own testimony as to what he believes he would have done.

JOSÉ A. CABRANES, Circuit Judge, concurring in part and dissenting in part:

I concur in Part II of the majority opinion holding that the officers here would have had probable cause to arrest Heath upon the plain view discovery of cocaine elsewhere on the scene only moments after Heath had been arrested, perhaps mistakenly but in good faith, by Lieutenant Paul. However, because I do not agree with the majority's assessment of what the inevitable discovery doctrine requires in this case, or the decision to remand to the district court for further fact-finding, I respectfully dissent from Parts I and III of the majority opinion.

The majority opinion requires that, for the inevitable discovery doctrine to apply in this case, the district court must be convinced with a "high level of confidence" not only (1) that the officers in question would have had probable cause to arrest Heath only moments after they had (arguably) prematurely arrested him—a question answered in the affirmative in Part II—but also (2) that the officers *actually would have arrested* Heath once they had probable cause to do so. For the reasons stated below, I disagree with the majority's decision to impose what could be called a "probable cause-plus" standard in the context of a search incident to an arrest—a well-established exception to the warrant requirement—by importing a standard more appropriately limited to those cases in which the police have engaged in a warrantless search of property otherwise unsupported by any exception to the warrant requirement. Moreover, even under the legal standard devised by the majority, I see no need to remand here so that the district court may confirm what is already apparent on the record—namely, that given the willingness of the officers in question to arrest Heath *without* probable cause, they inevitably would have done the same once they had *even greater* reason (*i.e.*, probable cause) to arrest Heath only moments later.

In requiring separate proof that the officers would have arrested Heath once they had probable cause to do so, the majority relies heavily on the implied "teachings" of our Court in *United States v. Cabassa*, 62 F.3d 470 (2d Cir.1995), as well as the gloss put on that case by the district court in *United States v. Lavan*, 10 F.Supp.2d 377 (S.D.N.Y.1998), and the Tenth Circuit's adoption of a "high level of confidence" standard in *United States v. Cunningham*, 413 F.3d 1199 (10th Cir.2005), and *United States v. Souza*, 223 F.3d 1197, 1205 (10th Cir.2000). I do not doubt that *Cabassa* and its progeny set forth a reasonable approach for those circumstances in which the police have entered into a home without a warrant. Indeed, prior cases have indicated that courts view warrantless property searches with suspicion and thus require a showing that the police had taken tangible steps to ensure that they inevitably would have obtained a warrant from a neutral and detached magistrate. *See, e.g., Cabassa*, 62 F.3d at 473 & n. 2 (requiring, "[i]n cases in which a claim of inevitable discovery is based on [the] expected issuance of a warrant," an analysis of (1) "the extent to which the warrant process has been completed at the time those seeking the warrant learn of the search"; (2) the strength of the showing of probable cause at the time the warrantless entry occurred; (3) whether a warrant was "actually obtained" after the illegal entry; (4) "whether the same evidence would have been discovered pursuant to the warrant" during a hypothetical subsequent search; and (5) whether there is any "evidence that law enforcement agents 'jumped the gun' because they lacked confidence in their showing of probable cause").

Courts require these detailed showings of "each of the contingencies" involved, *see Lavan,* 10 F.Supp.2d at 389, precisely because they do not wish to encourage officers to "obviate" or "nullif[y]" the Fourth Amendment's warrant requirement by baldly asserting that they inevitably would have had the probable cause needed to obtain a warrant. *See, e.g., United States v. Mejia,* 69 F.3d 309, 320 (9th Cir.1995) ("[T]o excuse the failure to obtain a warrant merely because the officers had probable cause and could have obtained a warrant would completely obviate the warrant requirement."); *United States v. Brown,* 64 F.3d 1083, 1085 (7th Cir.1995) ("To say that a warrant is required for a search is to say that the police must get judicial approval before acting. Yet if probable cause means that discovery is inevitable, then the prior approval requirement has been nullified."); *United States v. Cherry,* 759 F.2d 1196, 1205 (5th Cir.1985) ("When the police forego legal means of investigation simply in order to obtain evidence in violation of a suspect's constitutional rights, the need to deter is paramount and requires application of the exclusionary rule."); *cf. United States v. Eng,* 971 F.2d 854, 860 (2d Cir.1992) (noting that "special care is required on the part of a district court when the government relies on the subpoena power" in light of "the need to prevent the inevitable discovery exception from swallowing the exclusionary rule").

However, the concerns animating these cases—namely, the need to deter warrantless property searches—do not apply with equal force to the facts of this case. Not only were Lieutenant Paul and his fellow officers *lawfully* on the premises pursuant to a valid search warrant—thus reducing any significant concern that applying the inevitable discovery doctrine in this case would subvert the Fourth Amendment warrant requirement—the evidence here, and the logical inferences therefrom, dem-

onstrate that the police would have obtained Heath's currency during a valid search conducted pursuant to a well-established *exception* to the warrant requirement, namely, a search incident to a lawful arrest. *See United States v. Allen,* 986 F.2d 1354, 1357 (10th Cir.1993) ("[E]ven assuming that the [pat-down search of the defendant was conducted] prior to [the discovery of] the cocaine [on his companion], [the defendant] could ... have been searched seconds later, *once the cocaine provided probable cause to arrest....* Therefore, the search was incident to a lawful arrest *regardless of the exact sequence of events ....*") (emphases added); *United States v. Romero,* 692 F.2d 699, 704 (10th Cir.1982) (recognizing, without inquiring whether the officers *would* necessarily have arrested the defendant, that the "discovery of the marijuana in the van provided probable cause to arrest [the defendant], and *upon arrest the officers unquestionably would have searched [the defendant]* and discovered the marijuana in his pocket") (emphasis added); *see also United States v. Eylicio–Montoya,* 70 F.3d 1158, 1166–67 (10th Cir.1995) (applying inevitable discovery exception because, although the defendant had been "prematurely arrested," the police had reasonable suspicion to stop the defendant's vehicle and would have noticed the suspicious burlap bags "during the course of a lawful *Terry* stop").

Moreover, even if we were to distinguish the circumstances of this case from the clear import of the holdings in *Allen, Romero,* and *Eylicio–Montoya*—and thereby require evidence that the officers would in fact have arrested Heath once they had obtained probable cause to arrest him only moments after the initial (arguably) unlawful arrest—I see no need to remand for further fact-finding in this particular case. Absent a conclusion that the

officers here would only have arrested Heath when they *lacked* probable cause, there is little reason to conclude that the officers in question somehow would have backed down from their earlier decision to arrest Heath, even though they would have had a *stronger basis*—namely, probable cause—on which to make that very arrest immediately thereafter.

Our decision in *United States v. Eng,* 971 F.2d 854 (2d Cir.1992), provides a constructive framework of analysis for this case and, I believe, demonstrates that a remand would be unnecessary here. In *Eng,* we noted that "proof of inevitability is made more convincing when [1] the areas of the search or investigation are well-defined, [2] the government effort is planned and methodical, and [3] a direct causal relationship and reasonably close temporal relationship exist between what was known and what had occurred prior to the government misconduct and the allegedly inevitable discovery of the evidence." *Eng,* 971 F.2d at 859; *see also id.* at 861 ("[I]nevitable discovery analysis logically must begin with the progress of the investigation at the time of the government misconduct.").

In this case, each of these factors weigh heavily against the granting of a remand. Unlike a hypothetical scenario in which, for example, the police initially arrest a defendant without probable cause and then contend that they inevitably would have arrested the defendant days later, in a different location, and as part of a separate investigation, the "demonstrated historical facts," *see Nix v. Williams,* 467 U.S. 431, 444 n. 5, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984), here show that the officers would have obtained an independent basis of probable cause to arrest Heath (1) at the same location at which the original, arguably unlawful, arrest of Heath had taken place; (2) as part of the same search and investigation that led to the initial arrest; and (3) only "a few moments," Maj. Op. at 55, after the alleged government misconduct had occurred. It is precisely the seamless nature of the police search of the premises and the nearly simultaneous arrests of Heath and Summersett that should lead us to conclude here that there is no "residual possibility," *see Cabassa,* 62 F.3d at 474, that Heath would not have been arrested only moments later, at the same location, and as part of the same investigation. *See Allen,* 986 F.2d at 1357 (applying inevitable discovery doctrine where it was "clear that both searches occurred at approximately the same time"); *Romero,* 692 F.2d at 704 (noting that "the evidence clearly would have been discovered within a short time through a lawful investigation already underway"); *Lavan,* 10 F.Supp.2d at 389–90 (finding inevitability because "there were relatively few contingencies, and the probability that each would have been resolved in the government's favor was extraordinarily high"); *cf. Cabassa,* 62 F.3 d at 474 (noting that "no one can say with any certainty how much time would have been taken to complete the [warrant] application, to submit it to the magistrate judge for consideration, and to secure the warrant's issuance," and questioning even whether "the evidence would have been in the apartment when a lawful search occurred"); *Eng,* 971 F.2d at 861 (noting that "*some weeks* passed between the [warrantless] search of [the defendant's] safe and the issuance of some of the subpoenas" and that "[d]elays of this kind are not fully consistent with the suggestion that the government was informed and ready to move as soon as [the defendant] was arrested and the risk of flight removed") (emphasis added); *id.* at 862–64 (outlining in eight paragraphs several specific contingencies and unresolved factual inquiries necessitating a remand).

Accordingly, having determined in Part II of the majority opinion that the officers here would have had probable cause to arrest Heath based on the plain view discovery of cocaine elsewhere in the apartment, we should conclude, just as did the courts in *Allen, Romero,* and *Eylicio–Montoya,* that Heath's currency inevitably would have been discovered pursuant to a well-established exception to the warrant requirement (*i.e.,* in a search incident to arrest). Moreover, even if the inevitable discovery doctrine requires evidence that the officers in question inevitably would have arrested the defendant, no remand should be granted here due to the "demonstrated historical facts" already evident in the record.

JANET C. HALL, District Judge, concurring in part and dissenting in part.

Because the majority in Part II has misconstrued the record below, inadequately deferred to the lower court's findings, and lowered the threshold for a probable cause finding under the Fourth Amendment, I respectfully dissent from Part II of the majority opinion that finds the police had probable cause to arrest Heath. I also respectfully dissent from Part I of Judge Calabresi's opinion. Given the record before this court, there is not sufficient evidence on which to conclude that the police inevitably would have arrested Heath, and, accordingly, I concur in Part III of Judge Calabresi's opinion.

The task in this appeal is "to determine whether the trial court has applied the proper legal principles and whether its findings of fact are 'clearly erroneous.'" *Puritan Ins. Co. v. Eagle S.S. Co.,* 779 F.2d 866, 871 (2d Cir.1985). If the factual findings are not clearly erroneous, this court may not disturb them. *Id.* In undertaking this task, the court is required to give "considerable deference to the trial court's ... determination as to which of competing inferences should be drawn from the evidence of record." *Id.*

Contrary to the findings of the magistrate judge and the district judge, Judge Calabresi, in Part II, states that police found dime bags of cocaine in three separate locations, and that the court below made no finding concerning the origin of the cocaine found at one of those locations, the bottom of the stairs. *See* Maj. Op. (Part II) at 56 – 57, n.3. However, the court below found that dime bags of cocaine were found in two places, at the top landing of the stairs (under or near the prone Summersett) and at the bottom of the stairwell, and, based on the record, reasonably inferred that the dime bags were dropped by Summersett on his way to or from the bathroom.

The record clearly supports these findings. Lieutenant Paul testified that he "did observe what appeared to be cocaine on the *upper stairwell* on the landing underneath Summersett's legs as well as cocaine that was downstairs in the *bottom* of the *stairwell.*"[1] Suppression Hr'g Tr. at 11 (emphasis added). Several answers later, he testified that, "there was cocaine on the stairwell, at the bottom of the stairwell as well as the landing itself." *Id.* at 12; *see also id.* at 24. Thus, Paul identified two locations on the stairwell: upper and bottom.

The majority in Part II appears to read this latter testimony to "find" a third location and then states that the court below did not conclude that Summersett dropped the cocaine at the bottom of the stairs.

---

1. Notably, Paul did not see the three dime bags of cocaine at the top or the bottom of the stairs when he entered the residence, secured the stairway, climbed the stairs, and secured Summersett at the top of the stairs.

*See* Maj. Op. at 56 – 57, n.3. However, the court below did make that finding.[2] After noting that Paul observed the bags *both* at the top *and* the bottom of the stairs, the magistrate judge, in her Report and Recommendation that the district court adopted in full, inferred that the dime bags of cocaine fell from Summersett "on his way to or from the bathroom."[3] *See United States v. Heath,* No. 04–CR–6009T, slip op. at 4 (W.D.N.Y. May 25, 2004) (*"Heath I"*). This inference is strongly supported by the fact that Summersett was on the move when the police entered, and Heath was not.[4] Further record support for this inferential finding is that Summerset had bags of cocaine on and around him when he was ordered to lie down by Paul. *Id.* at 14. The court below then found that it could not infer that the dime bags were visible to Heath before the police entered. *United States v. Heath,* No. 04–CR–6009T(P), slip op. at 7–8 (W.D.N.Y. July 12, 2004) (*"Heath II"*). In fact, in referring to the residence as a whole, the district court specifically found that "the gov-

ernment offered *no evidence that drugs* or guns *were in sight prior* to the officers' entry, or that the property was being used as a drug house."[5] *Id.* (emphasis added). These findings and inferences must be reviewed only for clear error, *see Puritan Ins.,* 779 F.2d at 871, and must be viewed in a light most favorable to the prevailing party below, in this case Heath, *see United States v. Harrell,* 268 F.3d 141, 145 (2d Cir.2001).

After stating that the district court's factual findings concerning the cocaine did not include the three dime bags at the bottom of the stairs, the majority in Part II acknowledges that it cannot say that Heath saw the cocaine. Instead, it opines that whether Heath saw the dime bags of cocaine at the bottom of the stairs "is of no import." Maj. Op. Part II at 57. The majority in Part II cites several cases for the proposition that a "person of reasonable caution"—the circuit's standard when determining the existence of probable cause under *United States v. Rogers,* 129

2. The majority in Part II reads the second answer of Paul as adding a third location. However, the second answer supports the two-location finding if it is read as a general statement that there was cocaine on the stairwell, followed by the identification of the two specific places on the stairwell. The magistrate judge heard the testimony and inflection, and she made a factual finding that the cocaine was found at two locations. *United States v. Heath,* No. 04–CR–6009T, slip op. at 4 (W.D.N.Y. May 25, 2004) (*"Heath I"*).

3. While later in her Report the magistrate judge's reference to this factual finding and the inferences she draws from it are not as precise, *see Heath I* at 15, her earlier factual finding discussed above makes it clear that she is referring to *all* of the bags of cocaine that Paul eventually discovered. *Id.* at 4. Of course, to the extent this is unclear, these factual findings and inferences must be read in a light most favorable to the prevailing party below (i.e.Heath) requiring the conclusion that the magistrate judge was referring

to all of the cocaine discovered. *See United States v. Harrell,* 268 F.3d 141, 145 (2d Cir. 2001).

4. The majority in Part II of the opinion reads the record and lower court rulings narrowly, suggesting the only place that Summerset dropped cocaine was upstairs. However, the discovery of one dime bag in the living room, three at the foot of the stairs, and several at the top of the stairs outside a bathroom with a running toilet, supports the inference that Summerset went upstairs with the dime bags, dropping some on the way.

5. This latter conclusion is significant. The term "drug house" is, to this writer, a term of art. A drug house is a dwelling that is not a home, but rather is a place dedicated to the sale of drugs. Being present in a "drug house" would permit inferences that would not necessarily follow from mere presence in a house in which people reside, but from which drugs had been sold on two prior occasions.

F.3d 76, 79 (2d Cir.1997)—"could properly conclude that those who are permitted to observe obvious criminal activity in a home are, absent indications to the contrary, likely to be complicit in the offense." Maj. Op. (Part II) at 57 (citing *United States v. Pennington*, 287 F.3d 739, 747 (8th Cir. 2002); *United States v. Jones*, 72 F.3d 1324, 1332–33 (7th Cir.1995); *United States v. Holder*, 990 F.2d 1327, 1329 (D.C.Cir.1993), *United States v. Mac-Donald*, 916 F.2d 766, 768, 770 (2d Cir. 1990)(in banc); *Hollyfield v. United States*, 407 F.2d 1326, 1326 (9th Cir.1969)). Therefore, the majority in Part II concludes, the police would have had probable cause to arrest Heath based on the cocaine discovered in "plain view" at the bottom of the stairwell shortly after he was actually arrested. *See* Maj. Op. (Part II) at 57–58.

None of the cases relied on by the majority, however, support this broad proposition; furthermore, each case involved situations inapposite to the one here.[6] It is the absence of the fact of unavoidable observation of criminal activity, or even *some* evidence that Heath knew or could have known of the presence of cocaine, that serves as the point of distinction between the cases cited by the majority in Part II and this case. In *Pennington*, the defendant owned and resided in a house where authorities found drug manufacturing equipment in plain view and where there were odors in the house associated with methamphetamine production. 287 F.3d at 741,746. Similarly, in *Jones*, 72 F.3d at 1332, the police, upon entering the defendant's residence, observed the defendant's wife attempt to stuff an envelope full of counterfeit bills down her pants in his immediate presence. In addition, there were numerous items of contraband scattered in plain view throughout the house. *Id.* In *Holder*, the police found the defendant standing approximately five feet from several bags of cocaine base, a razor, a plate with cocaine base on it, and an individual sitting at a table who was holding a package of cocaine. 990 F.2d at 1327. In *MacDonald*, a case in which the defendant challenged the finding of exigent circumstances justifying a warrantless entry and not the finding of probable cause to arrest, the defendant, counting a stack of money and in reach of a gun, was present during an undercover drug sale that immediately proceeded the arrest. 916 F.2d at 768–69. The police in *MacDonald* also smelled marijuana in the apartment where the sale and arrest occurred. *Id.*

In each of these cases, it was unavoidable for the defendant to have observed the criminal activity in his presence based on one or more of the following findings: he was actively participating in it; he could not help but perceive the odor of drugs; he was in the presence of a notorious display of drugs; or he was an owner and a resident of the dwelling in which the plain view contraband discovery took place. It does not follow from these cases that probable cause hinges on the mere *possibility* of observing criminal activity in a dwelling. Rather, the defendants in these cases *actually* observed criminal activity. Moreover, the criminal activity in each of these cases was overwhelmingly conspicuous, in contrast to the potential presence of three dime bags of cocaine at

---

**6.** The only possible exception may be *Hollyfield*. There, the Ninth Circuit affirmed the district court's suppression decision in a two paragraph, *per curiam* opinion, holding that "[p]robable cause was given by the marijuana smoking paraphernalia in plain view in the apartment in which the arrest took place." 407 F.2d at 1326. No further description of the circumstances of the arrest are offered by the court.

the bottom of a flight of stairs.[7] For example, in *Holder*, the immediate proximity of the defendant to the contraband—a proximity which is lacking in the record of this case—was found necessary to support the inference that the defendant had knowledge of the criminal activity. As the *Holder* court opined:

> More crucially, in this case the drugs were *openly on display*, and therefore appellant's *proximity to the drugs clearly reflected his knowledge* of, and probably his involvement in, narcotics activity. . . . Unlike the situation in *Ybarra*, where the defendant's presence in a public tavern was itself ostensibly innocent, *Holder's* presence in a private apartment *just a few feet from a table full of cocaine* can hardly be so described. This is not a case in which officers' probable cause depended partly on mere "propinquity to others *independently* suspected of criminal activity." The grounds for suspecting [the other occupant] applied almost equally to Holder.

990 F.2d at 1329 (quoting *Ybarra v. Illinois*, 444 U.S. 85, 91, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979)) (first, second, and third emphasis added) (citation omitted). At most, the cases relied on by the majority in Part II stand for the proposition that probable cause exists where a person is undeniably in the presence of criminal activity; they do not support the broader proposition that merely inferring the possibility that a defendant was "permitted to observe" criminal activity provides sufficient probable cause to arrest. *See* Maj. Op. (Part II) at 57.

However, even if the standard utilized by the majority in Part II was correct, there is no basis in the record for inferring that Heath was "permitted to observe" the three dime bags of cocaine. As already noted, the district court found that there was "no evidence that drugs or guns were in sight prior to the officers' entry, or that the property was being used as a drug house." *Heath II* at 7–8. Asserting, as the majority in Part II does, that the "bags of cocaine at the *bottom* of the stairs were in plain sight when the officers discovered them," Maj. Op. (Part II) at 57, does not encompass the conclusion that the three dime bags of cocaine were in *Heath's* sight *before* the officers discovered them, and this assertion is not equivalent to the finding by the majority in Part II that they were in plain view at a time when Heath was permitted to see them, *see id.* at 57. Based on the record below, the possibility that Heath was permitted to observe criminal activity is pure speculation. Since the government bore the burden of proof at the suppression hearing, *see, e.g., Nix v. Williams*, 467 U.S. 431, 444 n. 5, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984); *see also United States v. Eng*, 971 F.2d 854, 859 (2d Cir.1992), this speculation cannot support a reversal of the district court.

There was also nothing in the record to suggest that Heath was an owner or tenant of the residence, or evidence to connect him to the residence, such as keys or mail. There was also no evidence as to Heath's relationship to Summersett, to the children found downstairs, or to anyone else with a connection to the residence. The inferences that could be drawn about the participation in criminal activity from the relationship of the defendants to the property and to each other in *Pennington* and *Jones* simply cannot be drawn here. Further, other than the putative dime bags, there is no physical evidence of conspicuous criminal activity occurring in the presence of Heath prior to the entry of law enforce-

---

7. *See supra* note 1.

ment, such as odors or paraphernalia, as was present in *Pennington, Jones, Holder*, and *MacDonald*. In those cases, such facts supported the conclusion that the defendant was implicated in the discovered criminal activity.

On the record before the court and the findings below, Supreme Court precedent compels the conclusion that Paul lacked probable cause to arrest and then search Heath. In each of several cases, a defendant was illegally searched, or arrested and then searched, based upon his mere proximity to suspected illegal activity. In *Ybarra*, the defendant was searched because he was in a bar whose bartender was suspected of dealing drugs. 444 U.S. at 88–89, 100 S.Ct. 338. In *United States v. Di Re*, the defendant was found in a car with an informant, a known suspect, and visible contraband. 332 U.S. 581, 583, 68 S.Ct. 222, 92 L.Ed. 210 (1948). In *Sibron v. New York*, the defendant was observed over the course of eight hours speaking to known drug addicts. 392 U.S. 40, 45, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968). The Supreme Court held in each case that a defendant's mere proximity to contraband, suspect individuals, or illegal activity did not give the police probable cause to search or arrest him.[8] *See Ybarra*, 444 U.S. at 90–91, 100 S.Ct. 338; *Di Re*, 332 U.S. at 592–93, 68 S.Ct. 222; *Sibron*, 392 U.S. at 62–64, 88 S.Ct. 1889. As the Su-

preme Court explained in *Ybarra*, "[A] person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person." 444 U.S. at 91, 100 S.Ct. 338 (citing *Sibron*, 392 U.S. at 62–63, 88 S.Ct. 1889). Such a search or seizure "must be supported by probable cause particularized with respect to that person. This requirement cannot be undercut or avoided by simply pointing to the fact that coincidentally there exists probable cause to search or seize another or to search the premises where the person may happen to be." *Id.*

This case is much closer to *Ybarra* than to the cases relied on by the majority in Part II. The location searched here was a private residence, and the police found a small amount of cocaine[9] in plain view in an open area. However, there is no evidence that Heath was a resident of the dwelling, that he made any suspicious movements or uttered any incriminating statements, or that he observed, or could have observed, or knew, or should have known, about the cocaine at the bottom of the stairwell. Nor did the government present any other evidence linking Heath to the cocaine found at the bottom of the stairwell. As stated in *Ybarra*, a search of a person must be based on probable cause "particularized" to that person. 444 U.S.

---

**8.** The majority in Part II distinguishes these cases from the instant case by noting that they each dealt with conduct that was "on its face, innocent." Maj. Op. (Part II) at 61 – 62. However, Heath's conduct was similarly innocent. *See Heath I* at 15 ("The record before this Court shows simply this: at mid-day, Heath was sitting on a bed, with a cell phone to this [sic] ear, in a closed upstairs bedroom where a bag of marijuana was hidden behind a mirror and a firearm concealed in a dresser drawer.").

**9.** The majority in Part II refers to the cocaine in the house as a "relatively large quantity of

drugs." Maj. Op. (Part II) at 58 n.4. However, the several dime bags located in the house could be estimated to total approximately a gram or two, certainly not a "large" quantity when compared to the quantities often encountered in drug possession cases. *Compare United States v. Gamble*, 388 F.3d 74, 77 (2d Cir.2004)(referring to 1.7 grams of cocaine base in 26 ziplock bags as a "small amount of drugs"), *with United States v. Lewis*, 386 F.3d 475, 478 (2d Cir.2004)(referring to five kilograms or more of cocaine as a "large amount[ ] . . . of cocaine.").

at 91, 100 S.Ct. 338. "[M]ere propinquity to others independently suspected of criminal activity" does not create probable cause particularized to the others present. *Id.*

The majority in Part II accepts the finding below that the cocaine near Summersett is attributable to him and not to Heath. Because the government did not offer any evidence to support a finding that the cocaine lying at the bottom of the stairs at the time of their entry—which may not have been present before their entry—was attributable to Heath, or that he knew or could have known about it, the government and the majority in Part II are left with the argument that Heath's mere presence in the residence (not in proximity to, or within sight of, the cocaine) is sufficient for a finding of probable cause to arrest and search him. This argument has been rejected by the Supreme Court. *See, e.g., Ybarra,* 444 U.S. at 91, 100 S.Ct. 338.

Therefore, on the record before this Court, I would affirm the ruling of the district court regarding the lack of probable cause to arrest Heath. Accordingly, I respectfully dissent from Parts I and II of the opinion.

However, given the majority's opinion in Part II, I concur in Part III of Judge Calabresi's opinion because the record before us does not support the conclusion that the police would have inevitably arrested Heath on the basis of the alternative source of probable cause discussed in Part II.