*United States v. Lauria (Molina)*

# In the

# United States Court of Appeals

# for the Second Circuit

———————

AUGUST TERM 2022

No. 21-2598-cr

UNITED STATES OF AMERICA

*Appellee,*

v.

ANTHONY LAURIA

*Defendant,*

ANTHONY MOLINA

*Defendant-Appellant.*

———————

ARGUED: NOVEMBER 10, 2022

DECIDED: JUNE 9, 2023

———————

Before: LEVAL, RAGGI, and PÉREZ, *Circuit Judges.*

———————

On appeal from a judgment of conviction entered in the United States District Court for the Southern District of New York (Román, *J.*) on multiple counts of substantive and conspiratorial Hobbs Act robbery and of the brandishing of a firearm during two crimes of violence (*i.e.*, the charged robberies), defendant Anthony Molina argues that the court erred (1) in relying on the inevitable

discovery doctrine to deny his motion to suppress evidence obtained through warrants supported by concededly defective affidavits, and (2) in charging the jury that a gun constitutes a firearm and refusing to give his requested jury instruction. Because we agree that the inevitable discovery doctrine does not apply in the circumstances of this case, and because the conceded misstatements in the affidavits were material to the issuing magistrate judges' probable cause determinations, remand is required for the district court to conduct a hearing to determine if the challenged evidence was admissible under the standard identified in *Franks v. Delaware*, 438 U.S. 154 (1978). As to the jury charge, the district court erred in instructing the jury that a gun is a firearm, *see United States v. Rosa*, 507 F.3d 142, 145 n.1 (2d Cir. 2007), and because we cannot conclude that this error was harmless as a matter of law, we vacate Molina's firearms convictions.

VACATED AND REMANDED.

––––––––––––––––––

RICHARD W. LEVITT (Zachary Segal, *on the brief*), Levitt & Kaizer, New York, NY, *for Defendant-Appellant*.

LINDSEY KEENAN, Assistant United States Attorney (Karl Metzner, Assistant United States Attorney, *on the brief*) *for* Damian Williams, United States Attorney for the Southern District of New York, New York, NY, *for Appellee*.

––––––––––––––––––

REENA RAGGI, *Circuit Judge*:

Defendant Anthony Molina stands convicted after a jury trial in the United States District Court for the Southern District of New York (Nelson S. Román, *Judge*) of conspiratorial and substantive Hobbs Act robbery of a Connecticut Verizon store in 2017 (Counts I and II); the brandishment of a firearm in the

commission of a crime of violence (*i.e.*, the robbery charged in Count II) (Count III); conspiratorial and substantive Hobbs Act robbery of a New York Verizon store in 2019 (Counts IV and V); and the brandishment of a firearm in the commission of a crime of violence (*i.e.*, the robbery charged in Count V) (Count VI). *See* 18 U.S.C. §§ 1951, 924(c)(1)(A)(ii) & 2. Now incarcerated, serving a total prison term of 192 months (*i.e.*, 16 years), Molina appeals his conviction arguing that the district court erred in (1) relying on the "inevitable discovery" doctrine to deny his motion to suppress evidence obtained through warrants supported by affidavits containing conceded misstatements, and (2) charging the jury that a gun constitutes a firearm and refusing to give Molina's requested clarifying instruction that "[a] pellet gun, imitation, facsimile or toy gun does not constitute a firearm within the meaning of the statute." App'x 58–59.

For reasons stated in this opinion, we vacate the district court's denial of Molina's motion to suppress certain evidence obtained through defective warrants on the ground of inevitable discovery. That exception to the exclusionary rule does not apply here, where the government cannot show that it inevitably *would* have discovered the challenged evidence through independent means but, instead, shows only that it *could* have discovered that evidence by redressing flaws in the warrant affidavits revealed by Molina's suppression motion. In the absence of inevitable discovery, and because the conceded misstatements in the warrant affidavits were material to the issuing magistrate judges' probable cause determinations, the district court could not admit the challenged evidence without conducting a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978), to determine the affiant's state of mind in making the misstatements at issue. Accordingly, we remand for such a hearing, with instructions that the district court maintain or vacate Molina's convictions on Counts I, II, IV, and V depending on its *Franks*-hearing findings.

3

As to the firearms counts of conviction, we conclude that the district court erred in charging the jury that "a gun is a firearm," App'x 63, in light of this court's precedent holding that "not all guns are firearms," *United States v. Rosa*, 507 F.3d 142, 145 n.1 (2d Cir. 2007). Because we cannot conclude that this error was harmless, we vacate Molina's convictions under Counts III and VI and remand for further proceedings consistent with this opinion, including possible retrial with a correct jury instruction.

## BACKGROUND

We begin by recounting particulars of the charged crimes as supported by evidence offered at Molina's 2021 trial. Thereafter, and as necessary to resolve Molina's appeal, we discuss the more limited facts (both accurate and mistaken) submitted in affidavits to support the challenged warrants.

## I. The Charged Robberies

On August 10, 2017, defendant Anthony Molina, together with co-conspirators Anthony Lauria and Brian Rodriguez, committed the armed robbery of a Verizon Wireless store in New Milford, Connecticut ("New Milford Robbery"). Some eighteen months later, on February 15, 2019, the three men committed the armed robbery of a Verizon Wireless store in Mahopac, New York ("Mahopac Robbery"). Both robberies were captured on surveillance footage, which demonstrated many shared characteristics, including the early evening time of the robberies; two men (*i.e.*, Molina and Rodriguez) robbing the stores, while a third (*i.e.*, Lauria) acted as getaway driver; the use of zip-ties to restrain victims; the brandishment of a gun during each robbery; and the use of the same, or a similar, Honda Accord to flee the robbery scene.[1] Because Molina and Rodriguez

---

[1] For his role in the charged robberies, Rodriguez pleaded guilty to one count of conspiracy to commit Hobbs Act robbery, wire fraud, and interstate transportation of stolen goods, *see* 18 U.S.C. § 371; *see also id.* §§ 1951, 1343, 2314, and one count of brandishing a firearm during the Mahopac Robbery, *see id.* §§ 924(c)(1)(A)(ii) & 2, for which crimes he was sentenced principally to 132 months' imprisonment. We

4

used a mask or a hat and sunglasses to conceal their faces during the robberies, no eyewitness identifications were obtained. Instead, the robbers' identities were established largely through forensic evidence, as detailed herein.

### A. New Milford Robbery

At 7:22 p.m. on August 10, 2017, Lauria entered the target New Milford Verizon store and asked a clerk about purchasing an iPhone. After exiting the store without making a purchase, Lauria walked toward a dark-colored Honda Accord with distinctive tire rims. Soon after, at 7:34 p.m., Rodriguez and Molina exited that Honda and entered the Verizon store. Brandishing a gun, Molina restrained two persons in the store with zip-ties and disabled many of the store's security systems. He and Rodriguez then proceeded to steal 77 Apple iPads and iPhones valued at $48,680 from the store's back room before fleeing the scene.

### B. Mahopac Robbery

At 7:40 p.m. on February 15, 2019, what appeared to be the same Honda sedan seen at the New Milford Robbery pulled up to the target Mahopac Verizon store. Within minutes, Rodriguez and Molina exited the Honda and entered the store. Once again, one of the robbers disabled many of the store's security systems. Also, Molina brandished a gun and zip-tied the wrists of a store clerk. This time, he and Rodriguez stole iPhones and other electronic devices valued at $54,745 from the store's safe before fleeing the scene.

---

affirm his conviction in a summary order also filed today. *See United States v. Lauria (Rodriguez)*, No. 21-2304 (2d Cir. June 9, 2023), Dkt. No. 91. Meanwhile, co-defendant Anthony Lauria, who pleaded guilty to one count of conspiratorial and one count of substantive Hobbs Act robbery for each of the two robberies, *see* 18 U.S.C. §§ 1951 & 2, and one count of using a firearm that was brandished during the Mahopac Robbery, *see id.* §§ 924(c)(1)(A)(ii) & 2, was sentenced principally to 108 months' imprisonment. Lauria has not appealed his conviction.

## II.    Investigations To Identify the Robbers

### A.    Fingerprint Implicates Lauria in the New Milford Robbery

Soon after the New Milford Robbery, that town's police began an investigation to identify the robbers, *inter alia*, taking witness statements, reviewing video surveillance footage, and recovering a fingerprint from the door of the target Verizon store.  A comparison of that fingerprint with those on file with New York State would later reveal the recovered print to match the right thumb of Anthony Lauria.

### B.    Anonymous Tip Implicates Lauria, Molina, and Rodriguez in the New Milford Robbery

Town police also posted surveillance video of the New Milford Robbery online.  On January 8, 2018, Connecticut State Police received an anonymous tip from two persons who had seen the video and identified the robbers as Lauria, Rodriguez, and Molina.  The tipsters provided Instagram account and contact information for these three persons—specifically, phone numbers ending in -3972 for Lauria, -1912 for Rodriguez, and -9885 for Molina.  By querying a law enforcement database, New Milford police were able to corroborate the tipsters' attribution of the -3972 number to Lauria.[2]  Further, by comparing a New York arrest photo of Lauria with surveillance footage of the unmasked man who entered and left the Verizon store shortly before the New Milford Robbery, town police were able to place Lauria at the scene of that crime.

---

[2] The FBI also subsequently developed evidence showing that the cell phone with a call number ending in -3972 was registered to Lauria and that the cell phone with a call number ending in -1912 was registered to Rodriguez.  Accordingly, in this opinion we refer to these devices as "Lauria's -3972 cell phone" and "Rodriguez's -1912 cell phone."

### C. Cell Phone Records

#### 1. The February 15 and May 18, 2018 State Warrants: Linking Lauria's -3972, Rodriguez's -1912, and Molina's -4879 Cell Phones to the New Milford Robbery

On February 15, 2018, New Milford police obtained from a Connecticut Superior Court judge a warrant for toll records and historical cell-site location information ("CSLI") for Lauria's -3972 cell phone for the month of August 2017. On May 18, 2018, police obtained another state warrant for the same information and time period for Rodriguez's -1912 cell phone. Responsive records revealed that throughout August 2017 these two cell phones were used exclusively in New York State *except* on August 10, 2017, *i.e.*, the date of the New Milford Robbery, when the phones were both used in New Milford. Between 3:06 p.m. and 11:47 p.m. on that date—*i.e.*, in an approximately nine-hour span that included the time of the New Milford Robbery—Rodriguez's -1912 cell phone communicated at least six times with Lauria's -3972 cell phone and at least seven times with a then-unidentified cell phone with a call number ending in -4879.[3]

#### 2. The March 4, 2019 SDNY Warrant: Linking Lauria's -3972, Rodriguez's -1912, and Molina's -2454 Cell Phones to the Mahopac Robbery

On March 4, 2019, approximately two weeks after the Mahopac Robbery, an FBI agent obtained from a magistrate judge in the Southern District of New York a "tower extraction" warrant directing several cell service providers to supply phone numbers that had accessed cell towers closest to the Mahopac Verizon store on February 15, 2019, between 6:30 p.m. and 8:30 p.m.—*i.e.*, a two-hour period including the time of that store's robbery.

---

[3] The FBI would not link this -4879 phone number to Molina until a year later when agents searched Rodriguez's -1912 cell phone, seized at the time of his April 30, 2019 arrest. *See infra* at 10.

In response, AT&T reported that its records for the specified period showed that Rodriguez's -1912 cell phone had used a cell tower near the victimized Mahopac store to communicate with Lauria's -3972 cell phone. Meanwhile, Sprint reported that its records for the specified period showed that Lauria's -3972 cell phone had used a cell tower near the Mahopac store to communicate with both Rodriguez's -1912 cell phone and a then-unidentified cell phone with a call number ending in -2454. No records obtained pursuant to the March 4, 2019 warrant, however, revealed the location of the -2454 cell phone when it communicated with Lauria's -3972 cell phone on the date of the Mahopac Robbery.[4]

### 3. The Challenged March 29 and April 23, 2019 SDNY Warrants: Further Linking Lauria's -3972, Rodriguez's -1912, and Molina's -2454 Cell Phones to the Mahopac Robbery

Molina does not challenge any of the warrants discussed thus far or the evidence obtained thereby. Rather, his appeal focuses on warrants obtained by the FBI on March 29 and April 23, 2019 (hereafter, "March 29 Warrant" and "April 23 Warrant"), as well as on subsequent warrants to the extent they were obtained in reliance on evidence resulting from the March 29 and April 23 Warrants.

The March 29 Warrant required cell phone servicers to provide toll records and historical CSLI for Lauria's -3972 cell phone, Rodriguez's -1912 cell phone, and Molina's -2454 cell phone (1) for the six-week period from July 10 to August 24, 2017, which included the August 10, 2017 date of the New Milford Robbery; and

---

[4] Sometime before March 29, 2019, the FBI determined that this -2454 number was associated with a business at which Molina worked. Further, on or about April 27, 2019, surveillance agents observed an individual matching Molina's description and located at Molina's home address answering a cell phone when the -2454 number was called. Molina would be located via and found in possession of this -2454 cell phone when arrested on April 30, 2019. *See infra* at 10. Accordingly, hereafter in this opinion, we refer to this device as "Molina's -2454 cell phone."

8

(2) for the six-week period from January 22 to March 5, 2019, which included the February 15, 2019 date of the Mahopac Robbery. *See* Molina's Mem. of Law in Supp. of Mot. to Suppress Evid. Ex. F at Warrant ¶ 6, *United States v. Lauria*, No. 19-CR-449 (NSR) (S.D.N.Y. June 8, 2020), Dkt. No. 55-6.[5]

Responsive records showed that all three cell phones were used in the vicinity of the Mahopac Verizon store on the date of that store's robbery, but were not used in Mahopac at any other time during the month of February 2019. Records further confirmed that Lauria's -3972 and Rodriguez's -1912 cell phones (but not Molina's -2454 cell phone) were used in the vicinity of the New Milford store on the date of that store's robbery, but were not used in New Milford or anywhere else in the state of Connecticut at any other time during the month of August 2017.

The April 23 Warrant required that for Rodriguez's -1912 and Molina's -2454 cell phones, cell phone servicers provide toll records and historical CSLI for the 82-day period from February 1 to April 23, 2019; prospective CSLI for the 45-day period from April 23 to June 7, 2019; and prospective pen register information for the 60-day period from April 23 to June 22, 2019. *See* Molina's Mem. of Law in Supp. of Mot. to Suppress Evid. Ex. G at Warrant ¶¶ 7–9, *United States v. Lauria*, No. 19-CR-449 (NSR) (S.D.N.Y. June 8, 2020), Dkt. No. 55-7. The record reveals little about the results of this warrant but, as Molina himself observes, it appears not to have "uncover[ed] any relevant evidence in addition to that uncovered by the March 29, 2019, Cell Site Warrant." Appellant Br. 16 n.7.

---

[5] The affidavit supporting the March 29 Warrant misattributes the -1912 cell phone to Molina and the -2454 cell phone to Rodriguez. This error was corrected in the April 23 Warrant affidavit. *Compare* Molina's Mem. of Law in Supp. of Mot. to Suppress Evid. Ex. F at Warrant Aff. ("March 29 Warrant Aff.") ¶ 4, *United States v. Lauria*, No. 19-CR-449 (NSR) (S.D.N.Y. June 8, 2020), Dkt. No. 55-6, *with* Molina's Mem. of Law in Supp. of Mot. to Suppress Evid. Ex. G at Warrant Aff. ("April 23 Warrant Aff.") ¶ 4, *United States v. Lauria*, No. 19-CR-449 (NSR) (S.D.N.Y. June 8, 2020), Dkt. No. 55-7. Thus, in discussing the March 29 Warrant, we refer to these devices as correctly attributed to Rodriguez and Molina, *i.e.*, Rodriguez's -1912 cell phone and Molina's -2454 cell phone.

### 4. The April 29–30, 2019 SDNY Warrants and the Robbers' Arrests

Approximately one week later, on April 29, 2019, an FBI agent filed a joint criminal complaint against Lauria, Rodriguez, and Molina, and obtained federal warrants permitting the use of cell-site simulators (known as "triggerfish") for Rodriguez's -1912 and Molina's -2454 cell phones to allow law enforcement agents to locate and arrest the men.[6] Rodriguez and Molina were both arrested the next day, with the -1912 cell phone seized from the former, and the -2454 cell phone seized from the latter.

Pursuant to further warrants obtained on April 30, 2019, agents searched the seized phones. From Rodriguez's -1912 cell phone, they retrieved at least seven saved contacts for "Molina." One entry was for Molina's -2454 cell phone. Another entry, denominated "Molina 4," had a call number ending in -4879—*i.e.*, the heretofore unidentified cell phone that had been in repeated contact with Rodriguez's -1912 cell phone on the day of the New Milford Robbery.[7]

### 5. The May 23, 2019 SDNY Cell-Site Warrant Links Molina's -4879 Cell Phone to the New Milford Robbery

On May 23, 2019, agents procured a federal warrant for toll records and historical CSLI for Molina's -4879 cell phone. Responsive records showed that Molina's -4879 cell phone was used in New Milford on the day of the New Milford Robbery.

---

[6] At this time, Lauria had already been arrested by New Milford police and released on bail. Thus, his location was apparently known to FBI agents, who arrested him on federal charges on April 30, 2019.

[7] Accordingly, we hereafter refer to the -4879 device as "Molina's -4879 cell phone."

### 6. The June 3, 2019 SDNY Warrant: DNA Links Molina to the Mahopac Robbery

A further June 3, 2019 warrant authorized federal agents to collect DNA samples from Lauria, Molina, and Rodriguez. Subsequent analysis revealed that Molina's DNA was a likely contributor to the DNA on a zip-tie used to restrain a victim of the Mahopac Robbery.

## III. District Court Proceedings

### A. Suppression Motion

On June 8, 2020, Molina moved, *inter alia*, to suppress evidence seized pursuant to the March 29 and April 23 Warrants, arguing that the affidavits used to support these warrants contained material misrepresentations. Molina also moved to suppress evidence seized pursuant to subsequent warrants to the extent those warrants depended on evidence derived from the March 29 and April 23 Warrants to establish probable cause. The government conceded misstatements in the March 29 and April 23 Warrant affidavits but argued that the inevitable discovery and corrected affidavit doctrines allowed it to avoid suppression.

### 1. The Acknowledged Misstatements

The March 29 Warrant affidavit contained numerous misstatements, one of which was corrected in the April 23 Warrant affidavit, but most of which were not.[8] Instead, they were repeated therein. The misstatements are not easily untangled from the totality of facts. Nevertheless, we endeavor to do so now.

*First*, as to the New Milford Robbery, the affidavits misstate that toll records for Lauria's -3972 cell phone showed that, on August 10, 2017, shortly before and shortly after the New Milford Robbery, that phone was in communication with

---

[8] As noted *supra* at Note 5, the March 29 Warrant affidavit misattributes the -2454 cell phone to Rodriguez and the -1912 cell phone to Molina, when the reverse is correct. This is corrected in the April 23 Warrant affidavit. *Compare* March 29 Warrant Aff. ¶ 4, *with* April 23 Warrant Aff. ¶ 4.

both Rodriguez's -1912 and Molina's -2454 cell phones. *See* March 29 Warrant Aff. ¶ 8(i); April 23 Warrant Aff. ¶ 9(i). In fact, the FBI did not then possess any records of communication on August 10, 2017, between Lauria's -3972 and Molina's -2454 cell phones.[9] Rather, at the time of the March 29 Warrant, the FBI possessed records showing communication between Lauria's -3972 and Rodriguez's -1912 cell phones and between Rodriguez's -1912 cell phone and a then-unidentified -4879 cell phone. The FBI would not link that last number to Molina until April 30, 2019, when Rodriguez was arrested and a search of his seized -1912 cell phone showed the -4879 cell phone listed as "Molina 4." In sum, the warrant affidavits incorrectly reported that electronic records had linked Molina to the New Milford Robbery when there was then no basis for that assertion.[10]

*Second*, as to the Mahopac Robbery, the affidavits repeatedly misdate that crime as February *19*, 2019, when it in fact occurred days earlier, on February *15*, 2019. *See* March 29 Warrant Aff. ¶¶ 7, 12(a); April 23 Warrant Aff. ¶¶ 8, 14(a). The affidavits then state that CSLI places Lauria's -3972, Rodriguez's -1912, and Molina's -2454 cell phones in the vicinity of the victimized Verizon store "on February 19, 2019" and that toll records show Lauria's -3972 cell phone in

---

[9] It would appear from the record that as of August 10, 2017, Molina was not using the -2454 number, as it was not registered to the business at which Molina worked until some six months after the New Milford Robbery.

[10] The challenged affidavits did not report that anonymous tipsters had linked Molina to the New Milford Robbery, though they did state that Molina, Lauria, and Rodriguez were Facebook friends. *See* March 29 Warrant Aff. ¶ 11; April 23 Warrant Aff. ¶ 13. Thus, on this appeal we do not consider how such anonymous information—as partially corroborated by fingerprint or electronic evidence linking Lauria and Rodriguez (but not Molina) to the New Milford Robbery—might have informed a probable cause determination for the challenged CSLI for Molina's -2454 cell phone. *See generally Illinois v. Gates*, 462 U.S. 213, 243–44 (1983) (upholding magistrate's reliance in issuing warrant on anonymous letter corroborated "in major part" by independent police work, explaining that "[i]t is enough, for purposes of assessing probable cause, that corroboration through other sources of information reduced the chances of a reckless or prevaricating tale, thus providing a substantial basis for crediting the [tipster's] hearsay" (internal quotation marks omitted)). *Cf. United States v. Gagnon*, 373 F.3d 230, 236 (2d Cir. 2004) (stating, with respect to informant, that corroboration properly informs assessment of information provided "because an informant who is right about some facts is more likely to be right about others").

communication with Rodriguez's -1912 and Molina's -2454 cell phones "on February 19, 2019, shortly before and after the Mahopac . . . Robbery."  March 29 Warrant Aff. ¶¶ 13, 14; April 23 Warrant Aff. ¶¶ 15, 16.  Because the robbery did not occur on February 19, 2019, phone records showing locations and communications on *that* date provide little information to support probable cause.  Here again, however, these paragraphs also misstate the date of the records.  The toll records and CSLI referenced therein actually date to February *15*, the date of the Mahopac Robbery, not to February 19, as reported to the magistrate judge.

*Third*, in addition to misdating the Mahopac Robbery and the referenced phone records, the affidavits err in stating that CSLI "from the closest cell tower to the Mahopac Store" showed that Lauria's -3972, Rodriguez's -1912, and Molina's -2454 cell phones were then "*all* in the vicinity of the Mahopac Store."  March 29 Warrant Aff. ¶ 13 (emphasis added); April 23 Warrant ¶ 15 (same).  In fact, when the March 29 and April 23 Warrants were obtained, Sprint records showed that on the date of the Mahopac Robbery (*i.e.*, February 15, 2019), Lauria's -3972 cell phone had accessed a cell tower near the victimized store in communicating with Molina's -2454 cell phone, but *no* records had yet been obtained showing what cell tower Molina's -2454 cell phone had accessed in that communication.  Agents would later discover that, on the date of the Mahopac Robbery, Molina's -2454 cell phone had, indeed, been in the vicinity of the victimized store when it communicated with Lauria's -3972 cell phone.  Their failure to obtain this information before applying for the March 29 and April 23 Warrants apparently resulted from an error in filing the initial request form, *i.e.*, an FBI agent had referenced the wrong time zone and, thus, obtained T-Mobile's Mahopac area tower records for the wrong time frame, which did not reflect any "pings" from Molina's -2454 cell phone.  It was Molina's suppression motion of June 8, 2020, that prompted federal agents to discover this error and to submit a corrected request form to T-Mobile, thereby obtaining records that would confirm the use of Molina's -2454 cell phone in Mahopac on the date of the Mahopac Robbery.  But

13

at the time of the challenged affidavits, there was no factual basis for such an assertion.

*Fourth*, similarly, without regard to the dating error, the affidavits misstate that toll records had been obtained showing Lauria's -3972 cell phone to have been in communication with Rodriguez's -1912 and Molina's -2454 cell phones "shortly before *and after* the Mahopac Store robbery." March 29 Warrant Aff. ¶ 14 (emphasis added); April 23 Warrant Aff. ¶ 16 (same). The referenced toll records showed such communication before, but not after, the robbery.

### 2. Denial of Suppression

In an opinion filed September 25, 2020, the district court considered whether, with acknowledged misstatements deleted, the March 29 Warrant affidavit nevertheless stated facts sufficient to establish probable cause to support a production order for records pertaining to Molina's -2454 cell phone. The district court concluded that it did not, explaining that "the evidence in the affidavit linking Molina to either robbery is meager" and, thus, "the false statements"—particularly the first and third misstatements noted above—"were necessary to the issuing judge's probable cause finding." *United States v. Lauria*, No. 19-CR-449 (NSR), 2020 WL 5743523, at *10 (S.D.N.Y. Sept. 25, 2020) (brackets and internal quotation marks omitted).

The district court nevertheless denied Molina's suppression motion, finding that the evidence at issue "would have inevitably been obtained" because the government "would have been able to remedy" the acknowledged misstatements in the warrant affidavit "independently" and to submit an amended affidavit establishing probable cause. *Id.* at *11. In so ruling, the district court credited the government's explanation that it had (1) resubmitted a corrected records request to service provider T-Mobile, which would yield records placing Molina's -2454 cell phone in the vicinity of the victimized Verizon store on the date of the Mahopac Robbery; and (2) linked Molina to the -4879 cell phone—and, thus, to the

14

New Milford Robbery—when it searched the -1912 cell phone seized from Rodriguez at the time of his arrest. The court concluded that "these independent means of obtaining the challenged information" afforded "a high level of confidence that such evidence would have inevitably been obtained." *Id.* On that basis, the district court concluded that suppression was properly denied without the need to conduct a hearing pursuant to *Franks v. Delaware* to determine the affiant's state of mind in making the material misstatements. *See id.* at *12.

### B. Superseding Indictment

On December 8, 2020, a grand jury sitting in the Southern District of New York returned a six-count superseding indictment, charging Molina with conspiratorial and substantive Hobbs Act robbery in connection with the New Milford Robbery (Counts I and II); the brandishment of a firearm in the commission of a crime of violence (*i.e.*, the New Milford Robbery) (Count III); conspiratorial and substantive Hobbs Act robbery in connection with the Mahopac Robbery (Counts IV and V); and the brandishment of a firearm in the commission of a crime of violence (*i.e.*, the Mahopac Robbery) (Count VI).

### C. Jury Charge on Firearms Counts

Molina's six-day jury trial began on June 15, 2021. Molina there adduced evidence tending to cast doubt on whether the weapons brandished during the charged robberies—not recovered by authorities—were "firearms" within the meaning of 18 U.S.C. § 924(c). Thus, a Verizon employee present during the New Milford Robbery, who testified that he concluded that the brandished weapon was "a real gun," admitted on cross-examination to having previously told prosecutors and law enforcement officers that he thought the object was "a plastic gun" or "a pellet gun." Trial Tr. 211–12. Also on cross-examination, another Verizon employee present during the New Milford Robbery testified that, when cocked, the brandished gun "sounded plastic." *Id.* at 389–90. Meanwhile, a Verizon employee present during the Mahopac Robbery, who testified that the brandished

weapon looked like a "hand pistol," conceded on cross-examination that he had only observed the weapon and had not come into physical contact with it. *Id.* at 35, 52–53. Finally, a police sergeant who had reviewed the Mahopac Robbery surveillance video acknowledged on cross-examination that he was unable conclusively to determine from the video "if it is a real gun or not." *Id.* at 78.

Based on this evidence, Molina's trial counsel proposed that the district court instruct the jury as to the § 924(c) counts that, "[a] pellet gun, imitation, facsimile or toy gun does not constitute a firearm within the meaning of the statute." *Id.* at 513. The district court denied the request, deeming the proposed language unnecessary because its proposed charge "reads . . . the definition of a firearm," and "indicates that it's the government's burden to demonstrate that [the weapon brandished is] a firearm as defined." *Id.* at 514. Counsel then requested that the district court strike the last sentence of its proposed charge, which stated, "I instruct you that a gun is a firearm," on the ground that "'[g]un' is an ambiguous statement" because it could include a "pellet gun." *Id.* at 514–15. Denying this request, the district court instructed the jury as follows:

> A firearm under the statute means any weapon, which will or is designed to or may readily be converted to expel a projectile by the action of an explosive. In considering this specific element of which the defendant used or carried or possessed a firearm, it does not matter whether the firearm was loaded or operable at the time of the crime. Operability is not relevant to your determination of whether a weapon qualifies as a firearm. I instruct you that a gun is a firearm.

*Id.* at 553–54.

## D. Verdict and Sentence

On June 23, 2021, the jury found Molina guilty of all six counts charged in the superseding indictment. On September 24, 2021, the district court sentenced Molina principally to four concurrent 24-month prison terms on Counts I, II, IV, and V (the robbery counts), and two 84-month prison terms on Counts III and VI

16

(the firearms counts), these last two terms to run consecutively to each other and to the 24-month concurrent terms, for a total prison sentence of 192 months, or 16 years.  The district court's October 12, 2021 judgment was entered on the docket on October 13, 2021, and Molina timely filed this appeal.

## DISCUSSION

### I.      Suppression Claim

Molina argues that the district court erred in allowing the jury to hear evidence obtained through warrants supported by materially false information. Specifically, Molina faults the district court's reliance on the inevitable discovery doctrine in denying his motion to suppress this evidence.  We agree that the inevitable discovery doctrine does not apply in this case and that the misstatements at issue were material to a finding of probable cause.  We therefore remand this case to the district court for it to conduct a *Franks* hearing as to the affiant's state of mind in making the challenged misstatements.

### A.      The Fourth Amendment's Exclusionary Rule

"The Fourth Amendment protects the right of private citizens to be free from unreasonable government intrusions into areas where they have a legitimate expectation of privacy."  *United States v. Newton*, 369 F.3d 659, 664 (2d Cir. 2004); *see* U.S. Const. amend. IV.  The Supreme Court has recognized a person to have such an expectation of privacy "in the record of his physical movements as captured through CSLI."  *Carpenter v. United States*, 138 S. Ct. 2206, 2217 (2018). The Court has further recognized government acquisition of CSLI from service providers to constitute a "search" within the meaning of the Fourth Amendment. *Id.*

"[T]he ultimate touchstone of the Fourth Amendment is reasonableness," which "generally requires the obtaining of a judicial warrant" to "ensure[] that the inferences to support a search are drawn by a neutral and detached magistrate"

17

rather than "the officer engaged in the often competitive enterprise of ferreting out crime." *Riley v. California*, 573 U.S. 373, 381–82 (2014) (internal quotation marks omitted). Accordingly, "the Government must generally obtain a warrant supported by probable cause before acquiring [CSLI] records." *Carpenter v. United States*, 138 S. Ct. at 2221. Searches conducted pursuant to such warrants are presumptively reasonable. *See Ganek v. Leibowitz*, 874 F.3d 73, 81 (2d Cir. 2017) (holding "search pursuant to a warrant issued by a judicial officer upon a finding of probable cause is presumptively reasonable"). Nevertheless, where the presumption is overcome, even evidence obtained pursuant to a warrant can be suppressed. *See United States v. Leon*, 468 U.S. 897, 922 (1984) (observing suppression not "always inappropriate in cases where an officer has obtained a warrant and abided by its terms").

The Fourth Amendment itself "'contains no provision expressly precluding the use of evidence obtained in violation of its commands'"; rather, the Supreme Court has "establish[ed] an exclusionary rule that, when applicable, forbids the use of improperly obtained evidence at trial." *Herring v. United States*, 555 U.S. 135, 139 (2009) (quoting *Arizona v. Evans*, 514 U.S. 1, 10 (1995)). As the Court has acknowledged, such a rule exacts "substantial social costs" because "[i]t almost always requires courts to ignore reliable, trustworthy evidence bearing on guilt or innocence." *Davis v. United States*, 564 U.S. 229, 237 (2011) (internal quotation marks omitted). Nevertheless, "society must swallow this bitter pill when necessary"; specifically, when "the deterrence benefits of suppression . . . outweigh its heavy costs." *Id.*; *see Herring v. United States*, 555 U.S. at 141 ("[T]he exclusionary rule is not an individual right and applies only where it results in appreciable deterrence." (brackets and internal quotation marks omitted)); *see also Riley v. California*, 573 U.S. at 403 (recounting history of Fourth Amendment as response to "the reviled 'general warrants' and 'writs of assistance' of the colonial era," opposition to which was "one of the driving forces behind the Revolution itself"). Thus, just as a warrant does not invariably make evidence

18

admissible, "[t]he identification of Fourth Amendment error does not automatically entitle a defendant to the suppression of evidence." *United States v. Felder*, 993 F.3d 57, 75 (2d Cir. 2021). Rather, "as with any remedial device, the application of the [exclusionary] rule has been restricted to those areas where its remedial objectives are thought most efficaciously served." *United States v. Leon*, 468 U.S. at 908 (brackets and internal quotation marks omitted).

The Supreme Court has instructed that the exclusionary rule does not apply when evidence is obtained "in objectively reasonable reliance on a subsequently invalidated search warrant." *Id.* at 922. In recognizing this "good faith" exception for searches conducted pursuant to warrants, the Court has reasoned that "[i]n most such cases, there is no police illegality," and "[p]enalizing the officer for the magistrate's error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations." *Id.* at 920–21. In so holding, however, the Court has made clear that suppression "remains an appropriate remedy if the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth," *id.* at 923 (citing *Franks v. Delaware*, 438 U.S. 154); *accord United States v. Moore*, 968 F.2d 216, 222 (2d Cir. 1992) (explaining that "good faith exception has parameters . . . in which it does not apply," including "where the issuing magistrate has been knowingly misled"), or "in situations where an officer is . . . 'grossly negligent' in seeking or executing a warrant," *United States v. Raymonda*, 780 F.3d 105, 118 (2d Cir. 2015) (quoting *Herring v. United States*, 555 U.S. at 144). However, where an affiant's misstatements are attributable to mere "negligence or innocent mistake," suppression is not required. *United States v. Lambus*, 897 F.3d 368, 399 (2d Cir. 2018) (alteration and internal quotation marks omitted) (discussing *Franks* standard).

Here, the district court concluded that the issuing magistrate judges had been misled insofar as the affidavits submitted in support of the government's applications for the March 29 and April 23 Warrants contained misstatements material to the identification of probable cause. Nevertheless, it concluded that it did not need to conduct a *Franks* hearing to determine the affiant's state of mind because another exception to the exclusionary rule applied in this case: the inevitable discovery doctrine. Molina argues that the district court misapplied the inevitable discovery doctrine in reaching this conclusion. On *de novo* review, *see United States v. Jones*, 43 F.4th 94, 109 (2d Cir. 2022), we agree that the doctrine does not apply in the circumstances of this case for reasons that we now explain.

## B.    The Inevitable Discovery Doctrine Does Not Apply in This Case

The inevitable discovery doctrine instructs that "'evidence obtained during the course of an unreasonable search and seizure should not be excluded if the government can prove that the evidence would have been obtained inevitably without the constitutional violation.'" *In re 650 Fifth Ave. & Related Props.*, 830 F.3d 66, 102 (2d Cir. 2016) (quoting *United States v. Heath*, 455 F.3d 52, 55 (2d Cir. 2006)).

The Supreme Court first recognized this exception in *Nix v. Williams*, 467 U.S. 431 (1984), identifying it as "closely related" and "functional[ly] similar[]" to the independent source doctrine—another exception to the exclusionary rule, *id.* at 443–44. The independent source doctrine "allows admission of evidence that has been discovered by means wholly independent of any constitutional violation" because exclusion of such evidence would not serve the exclusionary rule's deterrent purpose. *Id.* at 443. Instead, exclusion would put the prosecution "in a worse position simply because of some earlier police error or misconduct," thereby upsetting the balance between "the interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime." *Id.* In *Nix*, the Court applied the same reasoning to endorse the inevitable discovery doctrine as an extension of the independent

20

source doctrine: "If the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means . . . then the deterrence rationale has so little basis that the evidence should be received. Anything less would reject logic, experience, and common sense." *Id.* at 444 (footnote omitted).

Applying the inevitable discovery doctrine in *Nix*, the Supreme Court affirmed the denial of a motion to suppress evidence related to the body of a 10-year-old murder victim, which the defendant had helped law enforcement locate following an unlawful custodial interrogation. *See id.* at 448–50. At the time of the interrogation, some 200 volunteers were already methodically searching "all roads, abandoned farm buildings, ditches, culverts, and any other place in which the body of a small child could be hidden" within a multi-square mile area of a highway rest stop where items belonging to the missing child (and the defendant) had been found. *Id.* at 434–35. When the defendant agreed to show police where he had hidden the child's body, the search was halted, at which time searchers were only two and a half miles from the ditch in which the child's body was located—"essentially within the area to be searched." *Id.* at 436.

The Supreme Court held that the independent source doctrine did not apply in *Nix* because the defendant's statements "indeed led police to the child's body." *Id.* at 443. The inevitable discovery doctrine, however, did apply because "it is clear that the search parties were approaching the actual location of the body" when the defendant agreed to cooperate. *Id.* at 449. In short, had the defendant not led police to the body, "the volunteer search teams would have resumed the search . . . and the body inevitably would have been found." *Id.* at 449–50.

Soon after *Nix*, this court applied the inevitable discovery doctrine in affirming the denial of a motion to suppress a false passport and driver's license seized during a warrant-supported search of the defendant's apartment despite the fact that these items had been discovered a few hours earlier during an

unlawful, warrantless "bomb sweep" of the same premises. *See United States v. Whitehorn*, 829 F.2d 1225, 1231–32 (2d Cir. 1987). We explained,

> Agents at the F.B.I. office actually began the warrant application process over an hour before the illegal bomb sweep of [the defendant's] apartment occurred. They had already pinpointed the apartment to be searched. Through interviews with neighbors as well as prior extensive investigation, they knew that two of the apartment's occupants . . . had a history of trafficking in false identification documents, weapons, and explosives; indeed, the night before [they] had been arrested carrying all but the latter. In short, the agents had overwhelming probable cause before the bomb sweep to search the apartment in the belief that it was being used . . . as a "safe house" for federal fugitives in which false identification documents and other types of information detected by the bomb sweep reasonably could be expected to be found.

*Id.* at 1231.

As *Nix* and *Whitehorn* demonstrate, the inevitable discovery doctrine requires that the means by which the evidence would inevitably be discovered is independent from the means by which the evidence was actually—and unlawfully—discovered. Consistent with this principle, the investigation supporting a claim of inevitable discovery cannot itself have occurred only because the misconduct resulting in actual discovery was exposed. *See generally Nix v. Williams*, 467 U.S. at 448 (observing that "when . . . evidence in question would inevitably have been discovered *without reference to the police error or misconduct*, there is no nexus sufficient to provide a taint and the evidence is admissible" (emphasis added)); WAYNE R. LAFAVE ET AL., CRIMINAL PROCEDURE § 9.3(e) (4th ed. 2022) (observing that "fact making discovery inevitable must arise from circumstances other than those disclosed by the illegal search itself" (internal quotation marks omitted)).

22

This comports with the requirement for "a high level of confidence that each of the contingencies required" for lawful inevitable discovery of the disputed evidence "would in fact have occurred." *United States v. Heath*, 455 F.3d at 55; *accord In re 650 Fifth Ave. & Related Props.*, 830 F.3d at 102 ("We have previously characterized the Government's obligation as one of 'certitude' that the evidence would have been discovered."). In other words, the inevitable discovery doctrine does not apply simply because "a reasonable police officer *could have*" lawfully discovered the evidence at issue; rather, it applies where the record establishes "with a sufficiently high degree of certainty that a reasonable police officer *would have*" lawfully discovered the evidence regardless of the disclosure of any legal defect in the actual discovery of the evidence. *United States v. Heath*, 455 F.3d at 58 (emphases in original).

Here, the district court determined that the government would have inevitably discovered the CSLI placing Molina's -2454 cell phone in Mahopac at the time of the Mahopac Robbery because the government could have obtained a lawful warrant for these records once it corrected the timing error in the initial requisition form for tower records submitted to T-Mobile (and thereby learned that Molina's -2454 cell phone had "pinged" a tower in the vicinity of the Mahopac Verizon store on the date and close to the time that it was robbed). Further, the district court determined that the government inevitably would have discovered that Molina communicated with Rodriguez close to the time of the New Milford Robbery when it lawfully searched Rodriguez's -1912 cell phone (seized at the time of his arrest) and discovered contact information linking Molina to the -4879 cell phone number.

The fundamental flaw with the district court's reasoning is that it rests on the assumption that the government, *once alerted to defects in the March 29 and April 23 Warrants*, could easily have corrected or supplemented its initial supporting affidavits and thereby procured lawful warrants. But the inevitable

23

discovery doctrine does not ask whether the government lawfully *could have* obtained the evidence at issue by means of corrected warrant affidavits or that it would have done so after the defense alerted it to defects in its initial affidavits. Rather, inevitable discovery asks whether the government has shown that it certainly *would have* discovered the evidence by a lawful means even if no warrant had been issued or challenged. That is not this case.

The record here indicates that, but for the defense's exposure of misstatements in the warrant affidavits, the government would have had no reason—and, therefore, would have been unlikely—to pursue alternative lawful means to procure the evidence at issue. Certainly, the record is bereft of any evidence that, in the two-month interval between the government learning of Molina's link to the -4879 cell phone and Molina's suppression motion, the government took any steps to seek new warrants lawfully to obtain the challenged evidence. Similarly, no record evidence indicates that, before Molina's suppression motion highlighted dating and other errors in the warrant affidavits, the government took any steps to correct those affidavits or otherwise ensure probable cause for the warrants they supported.[11] In these circumstances, Molina's suppression motion could not be denied on the ground of inevitable discovery.

## C. Remand Required for Further *Franks* Inquiry

### 1. The Two-Part *Franks* Inquiry

In the absence of an inevitable-discovery exception, Molina's suppression motion is properly reviewed under *Franks v. Delaware*, 438 U.S. 154. The Supreme Court there held that where a search is conducted pursuant to a judicially authorized warrant, a "presumption of validity" obtains "with respect to the

---

[11] Thus, on this appeal we have no occasion to consider whether the challenged evidence would have been admissible if the government had actually obtained new warrants supported by affidavits containing no misstatements.

24

affidavit supporting the search warrant." *Id.* at 171. To overcome that presumption, a defendant must,

> make[] a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request. In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.

*Id.* at 155–56. Thus, a defendant seeking "[t]o suppress evidence obtained pursuant to an affidavit containing erroneous information" must satisfy both a state of mind requirement and a materiality requirement by showing that "'(1) the claimed inaccuracies or omissions are the result of the affiant's deliberate falsehood or reckless disregard for the truth; and (2) the alleged falsehoods or omissions were necessary to the issuing judge's probable cause finding.'" *United States v. Canfield*, 212 F.3d 713, 717–18 (2d Cir. 2000) (brackets omitted) (quoting *United States v. Salameh*, 152 F.3d 88, 113 (2d Cir. 1998)). The materiality requirement is often considered first because, as the Supreme Court explained in *Franks*, "if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant to support a finding of probable cause, no hearing is required." 438 U.S. at 171–72; *see* 2 WAYNE R. LaFAVE, SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 4.4(c) (6th ed. 2022) (explaining that "*Franks* approach . . . obviates the need for any hearing at all except in those cases in which the allegedly false statement would undo the probable cause finding"). *See generally United States v.*

*Trzaska*, 111 F.3d 1019, 1027 (2d Cir. 1997) (observing that "[e]very statement in a warrant affidavit does not have to be true" to avoid suppression).

### 2. The Misstatements in This Case Were Material to Identifying Probable Cause To Obtain CSLI for Molina's -2454 Cell Phone

#### a. Correcting the Challenged Affidavits Requires Deletion of Misstatements, not Addition of Truthful Facts Known at the Time of the Applications

To determine the materiality of alleged misstatements, courts "correct" the warrant affidavit and determine whether the affidavit, so corrected, establishes probable cause. If it does, the misstatements were immaterial, and suppression is unnecessary. If it does not, the misstatements were material, and the court must proceed to consider the affiant's state of mind in making the statement. *See id.* at 1027–28.

The government suggests that affidavit correction not only requires the deletion of misstatements but also permits the addition of truthful information supporting probable cause that was possessed by investigating officers at the time the warrant was sought. *See* Suppl. Appellee Br. 3–4. This court appears first to have applied this expansive view of the corrected affidavit doctrine in a civil rights action against law enforcement officers for money damages. *See Martinez v. City of Schenectady*, 115 F.3d 111, 115 (2d Cir. 1997) (stating that "'corrected affidavits' doctrine . . . requires us to examine all the information the officers actually possessed when they applied for the search warrant"). It is only in that context, however, that we have so applied the doctrine. *See, e.g., Escalera v. Lunn*, 361 F.3d 737, 743–44 (2d Cir. 2004); *accord Ganek v. Leibowitz*, 874 F.3d at 85 n.6; *McColley v. County of Rensselaer*, 740 F.3d 817, 823 (2d Cir. 2014).

By contrast, in criminal cases—where the question is not whether to award damages against individual officers but whether to admit unlawfully obtained

evidence in support of conviction—this court has applied the doctrine more narrowly, stating that "related facts which were also known [by law enforcement officers] at the time of the [warrant] application . . . lie outside the scope of a proper *Franks* inquiry because the relevant question is whether the *remaining portions* of the affidavit give rise to probable cause." *United States v. Awadallah*, 349 F.3d 42, 70 n.22 (2d Cir. 2003) (emphasis in original) (internal quotation marks omitted); *see also United States v. Lowe*, 516 F.3d 580, 585 n.2 (7th Cir. 2008) (stating that "reviewing court should simply look at the affidavit with the false statements excised instead of also considering the new, truthful information presented at, for instance, a *Franks* hearing"). Thus, in the context of a criminal case, a warrant affidavit may be corrected by supplementation only when the supplemental information detracts from, rather than supports, probable cause. *See United States v. Rajaratnam*, 719 F.3d 139, 146 (2d Cir. 2013) (observing that "literal *Franks* approach does not seem adequate" for omissions, which "cannot be deleted; therefore a better approach would be to insert the omitted truths revealed at the suppression hearing" (brackets, ellipses, and internal quotation marks omitted)); *United States v. Yusuf*, 461 F.3d 374, 388 n.12 (3d Cir. 2006) ("Additional information may be incorporated into an affidavit only if we determine that a government agent made a material omission."); *see also United States v. Colkley*, 899 F.2d 297, 301 (4th Cir. 1990) ("For an omission to serve as the basis for a hearing under *Franks*, it must be such that its inclusion in the affidavit would defeat probable cause for arrest."). In making this exact point, Professor LaFave has observed,

> an affidavit with knowing falsehoods in it . . . should not be open to rehabilitation by a process of substituting for the affiant's lies other information that is really the truth from which he deliberately departed. To treat the case as an omission situation and then substitute that which was "omitted" fails to recognize that such

27

addition to the affidavit is appropriate only as to omitted information tending to cast some doubt on the probable cause otherwise shown.

2 LAFAVE, SEARCH AND SEIZURE, *supra* at 25 § 4.4(c).

In sum, the expansive view of the corrected affidavit doctrine applied in civil damages actions is not pertinent here. The materiality of the acknowledged misstatements in this criminal case must be determined by deleting these misstatements from the March 29 and April 23 Warrant affidavits and then deciding whether facts remaining in the affidavits are sufficient to establish probable cause. This is a legal question that we review *de novo*. *See United States v. Canfield*, 212 F.3d at 717.

> **b.** **The Corrected Warrant Affidavits Do Not Identify Probable Cause To Obtain Molina's -2454 Cell Phone Records**

As noted *supra* at 11–14, the March 29 and April 23 Warrant affidavits contain numerous misstatements requiring correction.

*First*, the March 29 Warrant affidavit incorrectly attributes Molina's -2454 cell phone to Rodriguez and Rodriguez's -1912 cell phone to Molina. *See supra* at Note 5. This error was corrected, however, in the April 23 Warrant affidavit, which appears to have yielded the same evidence with respect to Molina as the March 29 Warrant. For that reason and because the March 29 Warrant affidavit fails to provide probable cause for the issuance of the March 29 Warrant even with accurate attributions for these cell phones, *see infra* at 33–35, we do not consider this misstatement further.

*Second*, the affidavits state that on August 10, 2017, shortly before and after the New Milford Robbery, Lauria's -3972 cell phone was in communication with both Rodriguez's -1912 and Molina's -2454 cell phones. In fact, there was no evidence of communication between Lauria's -3972 and Molina's -2454 cell phones

28

on August 10, 2017. Thus, consistent with the law discussed *supra* at 26–28, we correct the affidavits by deleting this statement. We do not, however, add the then-known fact that, on the date of the New Milford Robbery, Rodriguez's -1912 cell phone was in repeated communication with a -4879 number, or the subsequently learned fact that the -4879 number was linked to Molina.

*Third,* the affidavits state that the Mahopac Robbery occurred on February 19, 2019, when it in fact occurred on February 15, 2019. Here, too, we do not substitute the actual robbery date for the misstated one. Rather, we delete the erroneous day of the month from the affidavits, leaving only the correct statement that the Mahopac Robbery occurred in February 2019.

*Fourth,* the affidavits report toll records and CSLI pertaining to Lauria's -3972, Rodriguez's -1912, and Molina's -2454 cell phones for the date February 19, 2019. Because the records in fact pertain to February 15, 2019, we delete the erroneous day of the month reported in the affidavits, leaving only the correct month and year.

*Fifth,* the affidavits report that the referenced CSLI shows Lauria's -3972, Rodriguez's -1912, and Molina's -2454 cell phones *all* to have been in the vicinity of the Mahopac store on February 19, 2019. In fact, the FBI had no information as to where these phones were on February 19. As for February 15, the date of the Mahopac Robbery and the referenced records, the records showed only Lauria's -3972 and Rodriguez's -1912 cell phones to have been in Mahopac. The location of Molina's -2454 cell phone on the February 15, 2019 robbery date was then unknown. Thus, we delete any reference to the location of Molina's -2454 cell phone, whether on February 15 or February 19.

*Sixth,* the affidavits report that "on February 19, 2019, shortly before and after the Mahopac Store robbery," Lauria's -3972 cell phone was in communication with both Rodriguez's -1912 and Molina's -2454 cell phones. Two misstatements

29

here call for correction: (1) the February 19 date, and (2) the report of communications "after" the Mahopac Robbery, for which there was then no factual basis. Thus, the corrected statement is that "in February 2019, shortly before the Mahopac Store robbery," there was the reported communication among the three phones.

With these corrections, the affidavits state the following pertinent facts:

1.   The New Milford and Mahopac Robberies were each committed

     (a)   at a "cellular phone store,"

     (b)   at approximately the same time of day (*i.e.*, 7:45 p.m.),

     (c)   by three persons (one described at both robberies as a "thin, white male"),

     (d)   employing the same general *modus operandi*, *i.e.*, (i) robbing the stores at gunpoint, (ii) restraining victims with zip-ties, and (iii) fleeing the scene in "a dark-colored Honda Accord sport, with distinctive [tire] rims."

     March 29 Warrant Aff. ¶¶ 8, 12; April 23 Warrant Aff. ¶¶ 9, 14.

2.   A fingerprint lifted from the east door of the New Milford store, through which one robber had exited, matched a fingerprint of Lauria's retrieved from a law enforcement database. *See* March 29 Warrant Aff. ¶ 8(f), (h); April 23 Warrant Aff. ¶ 9(f), (h).

3.   Various records linked a -3972 cell phone to Lauria, a -1912 cell phone to Rodriguez, and a -2454 cell phone to Molina. *See* April 23 Warrant Aff. ¶¶ 4, 10.

4.   Toll records showed communication "shortly before and shortly after" the New Milford Robbery between Lauria's -3972 and Rodriguez's -1912 cell phones. March 29 Warrant Aff. ¶ 8(i); April 23 Warrant Aff. ¶ 9(i).

5. Lauria's Facebook page showed him to be "friends" with "Suspects" Brian Rodriguez and Anthony Molina.  March 29 Warrant Aff. ¶ 11; April 23 Warrant Aff. ¶ 13.

6. During the Mahopac Robbery, one of the robbers had referred to another robber as "Brian."  March 29 Warrant Aff. ¶ 12(g); April 23 Warrant Aff. ¶ 14(g).

7. Cell tower logs showed that Lauria's -3972 and Rodriguez's -1912 cell phones had been in the vicinity of the victimized Mahopac store during the month of the Mahopac Robbery.  *See* March 29 Warrant Aff. ¶ 13; April 23 Warrant Aff. ¶ 15.

8. Toll records showed that "shortly before" the Mahopac Robbery, there was communication between Lauria's -3972 cell phone and Rodriguez's -1912 and Molina's -2454 cell phones.  March 29 Warrant Aff. ¶ 14; April 23 Warrant Aff. ¶ 16.

The law is well established that probable cause to search a location for—or, in the case of CSLI, to demand—particular items or records is demonstrated where a totality of circumstances indicates a "fair probability that contraband or evidence of a crime will be found" thereby.  *Illinois v. Gates*, 462 U.S. 213, 238 (1983).  This standard does not demand "hard certainties," *id.* at 231 (internal quotation marks omitted), but it does require more than a "hunch," the latter being insufficient to support even an investigative stop, *Terry v. Ohio*, 392 U.S. 1, 22, 27 (1968).  Rather, probable cause must be grounded in sufficient facts to establish the sort of "fair probability" on which "reasonable and prudent men, not legal technicians, act." *Illinois v. Gates*, 462 U.S. at 231, 238, 241 (internal quotation marks omitted); *see Florida v. Harris*, 568 U.S. 237, 244 (2013) (describing probable cause as "practical," "common-sensical," "all-things-considered" standard for assessing probabilities in particular factual context).  That showing is, in turn, informed by the breadth of the search authorization sought.  *See United States v. Clark*, 638 F.3d 89, 94 (2d Cir. 2011) (cautioning that "breadth of" search must not "outrun[] the probable cause supporting the warrant").  *See generally Maryland v. Garrison*, 480 U.S. 79, 84 (1987)

31

(observing that search authorization is properly limited to "specific areas and things for which there is probable cause" to search to "ensure[] that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit").

On this appeal, we review warrants authorizing broad CSLI searches for Molina's -2454 cell phone records supported by few facts. As to breadth, the warrants authorized disclosure of minute-by-minute location data for Molina's -2454 cell phone for six weeks in 2017 and six weeks in 2019 (the March 29 Warrant), and for over four months in 2019 (the April 23 Warrant). *See supra* at 8– 9. This calls for some caution in assessing probable cause because, as the Supreme Court has observed, modern cell phone usage is so ubiquitous that this type of location information can reveal not only nearly the whole of an individual's movements but also, in the process, much about his personal and professional life. *See Carpenter v. United States*, 138 S. Ct. at 2217 (explaining, in context of ruling that government acquisition of CSLI is "search" within meaning of Fourth Amendment, that these records "provide[] an all-encompassing record of the [cell phone user's] whereabouts . . . [,] revealing not only his particular movements, but through them his familial, political, professional, religious, and sexual associations" (internal quotation marks omitted)); *see also Riley v. California*, 573 U.S. at 385 (remarking that "modern cell phones" are "such a pervasive and insistent part of daily life that the proverbial visitor from Mars might conclude they were an important feature of human anatomy").[12]

---

[12] Because Molina does not challenge the government's initial procurement of the narrower March 4, 2019 tower extraction warrant for information identifying cell phone numbers that accessed towers closest to the Mahopac store in a two-hour period on the date of the Mahopac Robbery, *see supra* at 7–8, we need not here consider whether such a warrant presents the same privacy concerns as those highlighted in *Carpenter*. The question appears open because, in *Carpenter*, the Supreme Court stated that its holding that a government demand for historical CSLI constitutes a search is "narrow," and that it expressed no view "on matters not before us," such as the "download[ing] of information on all the devices that connected to a particular cell site during a particular interval." *Carpenter v. United States*, 138 S. Ct. at 2220. Thus,

On correction of the challenged affidavits, only two "facts" relating specifically to Molina or to his -2454 cell phone support these expansive warrants: (1) Molina is Facebook "friends" with Lauria, and (2) Molina's -2454 cell phone was in communication with Lauria's -3972 cell phone in February 2019 "shortly before" the Mahopac Robbery. *See supra* at 30–31. These facts are insufficient to demonstrate a "reasonable probability" that the sought months of records for Molina's -2454 cell phone would contain evidence pertaining to the New Milford and Mahopac Robberies.

Upon correction, the challenged affidavits contain *no* facts linking Molina or his -2454 cell phone to the New Milford Robbery. Molina's Facebook friendship with Lauria does not do so. The mere fact that persons know each other does not make it probable that they are criminal confederates. *See generally Dufort v. City of New York*, 874 F.3d 338, 350 (2d Cir. 2017) (holding probable cause to arrest not established "simply because a suspect has suspicious acquaintances"). Such a conclusion is particularly apt here where the warrant affidavits contain no information as to the number of Molina's Facebook friends or the anonymous tip that first identified the three men as participants in the New Milford Robbery.[13]

---

*Carpenter*'s ruling gives no reason to doubt that law enforcement officers lawfully could have obtained more limited cell tower information—for example, information simply telling whether Molina's -2454 cell phone was in the vicinity of the Mahopac store at or near the time of the robbery—without need to show probable cause that Molina or the -2454 cell phone in particular were involved in the robbery, *see United States v. James*, 3 F.4th 1102, 1105–06 (8th Cir. 2021), *cert. denied*, 142 S. Ct. 1352 (2022), and even without need to show probable cause at all, *cf. Donovan v. Lone Steer, Inc.*, 464 U.S. 408, 415 (1984) (stating that administrative subpoenas require "that the subpoena be sufficiently limited in scope, relevant in purpose, and specific in directive so that compliance will not be unreasonably burdensome" and holding that "the defenses available to [the recipient] do not include the right to insist upon a judicial warrant a condition precedent to a valid administrative subpoena" (internal quotation marks omitted)), *discussed in Carpenter v. United States*, 138 S. Ct. at 2254 (Alito, *J.*, dissenting).

[13] *See* Aaron Smith, *What People Like and Dislike About Facebook*, Pew Rsch. Ctr. (Feb. 3. 2014), https://www.pewresearch.org/fact-tank/2014/02/03/what-people-like-dislike-about-facebook/ (reporting that average number of Facebook "friends" for adults is 338, with "27% of 18–29 year old Facebook users hav[ing] more than 500 friends in their network").

As for communication between Lauria's -3972 and Molina's -2454 cell phones "shortly before" the Mahopac Robbery, that fact is insufficient to warrant the production of months of detailed CSLI for the -2454 cell phone. That conclusion is reinforced by what the affidavits do *not* say about this communication. They do not say whether Lauria's -3972 cell phone or Molina's -2454 cell phone initiated the call. They do not indicate what the affiant means by "shortly before" the robbery, a point that takes on added significance when the original misstated February 19, 2019 date is corrected to reference the entire month of February 2019. They do not indicate how many calls these two cell phones made on the date they communicated with each other. If Lauria's -3972 cell phone initiated the call within minutes of the robbery, and made and received few other calls around that time, that might provide a reasonable basis to think it probable that the subject of the call was the robbery and that the call recipient was a confederate in the crime. But that probability diminishes as the call becomes more temporally remote from the crime and as the number of calls placed and received increases. Further, if Molina's -2454 cell phone initiated the call, even shortly before the robbery, the possibility of coincidence increases, particularly in the absence of any affidavit facts establishing the location of the -2454 cell phone or otherwise linking that phone, or Molina himself, to the robberies at issue.[14]

---

[14] In other search contexts, this court has cautioned against confusing "a fair probability that contraband or evidence of a crime will be found in a particular place" with "probable cause to think that the person whose premises are to be searched is implicated in the crime." *Ganek v. Leibowitz*, 874 F.3d at 82 (internal quotation marks omitted); *see Zurcher v. Stanford Daily*, 436 U.S. 547, 554 (1978). This is not to ignore the fact that probable cause as to a person's criminal conduct can sometimes inform probable cause to search a place used or frequented by that person or to obtain records for electronic devices linked to that person. It is for that reason that we here note that the corrected affidavits' failure to demonstrate probable cause to think that Molina participated in the subject robberies reinforces the conclusion that the affidavits fail to demonstrate probable cause to think that months of CSLI records for Molina's -2454 cell phone would yield evidence of a crime.

Subsequently obtained records show that Molina's -2454 cell phone did initiate the call in question. *See* Crim. Compl. ¶ 25(h). But subsequently obtained records also show that Molina's -2454 cell phone was in Mahopac when it initiated that call, just as his -4879 cell phone was in New Milford when communicating with Lauria's -3972 cell phone on the date of the New Milford Robbery. Had such facts been included in the challenged warrant affidavits, they might well have provided the probable cause necessary to demand toll records and CSLI for the -2454 cell phone for the extended periods sought. The point for purposes of our review, however, is that the corrected warrant affidavits provide no such information. The sparse facts they provide pertaining to Molina and his -2454 cell phone do not admit the probable cause findings necessary to support the broad March 29 and April 23 Warrants.

Accordingly, because we conclude that the corrected affidavits do not state probable cause to support the expansive March 29 and April 23 Warrants, we conclude, as the district court did, that the deleted misstatements were material. But because we hold, contrary to the district court, that the inevitable discovery doctrine does not here apply, we conclude that a *Franks* hearing was necessary before admitting evidence obtained by these warrants. We therefore remand to the district court for that purpose.

### 3. The *Franks* Hearing on Remand

Under the *Franks* standard, material misstatements in warrant affidavits do not necessarily demand suppression of evidence. To the contrary, even where misstatements are material, a defendant's motion to suppress must be denied "unless the misrepresentations . . . were intentional or deliberate, or were made in reckless disregard for the truth." *United States v. Lambus*, 897 F.3d at 399. Misstatements resulting from "negligence or innocent mistake do not warrant suppression." *Id.* (alteration and internal quotation marks omitted).

On the record as it stands before this court, the misstatements in the March 29 and April 23 Warrant affidavits could be more indicative of negligence or mistake than intentional falsity or reckless disregard for the truth. The number of cell phones under investigation, the time required to link particular phones to particular users, and the number of service providers producing cell phone records could support a finding that confusion rather than intent to "deceive" or "mislead" may explain misattributions of phone users and locations. *See id.* (using terms interchangeably). A measure of good faith also might be located in state and federal officials' routine and repeated application for judicial warrants to support their procurement of evidence, as well as in their proceeding incrementally, temporally limiting initial warrant requests for records of a few hours on specific dates and expanding to weeks and months only as incriminating information was obtained. Nothing in the record as developed so far shows a motive for the warrant affiant to have deliberately or recklessly misled an issuing magistrate judge as to the known facts. Indeed, it appears that an accurate presentation of facts known to the FBI at the time of the warrant applications—certainly with respect to the date of the Mahopac Robbery and certain phone records already obtained, as well as law enforcement's receipt of an apparently reliable tip implicating Molina in the New Milford Robbery—might "have strengthened, not weakened, the application's proffer as to probable cause." *Id.* at 400–01 (concluding that such circumstances were more indicative of "carelessness and negligence than . . . knowing or deliberate falsehoods, reckless disregard, or perjury"). On the other hand, it is possible that with more factual development concerning the warrant affiant's state of mind, the pervasiveness of errors could support a finding that that certain misstatements were made deliberately or with reckless disregard for the truth.

We do not pursue the matter further ourselves because whether an affiant acted negligently or with an intent to "deceive" or "mislead" or with a "reckless disregard for the truth is a factual question" best addressed by the district court,

36

which is better situated to develop the factual record, observe the witnesses, and assess their credibility. *Id.* at 399 (internal quotation marks omitted). We nevertheless note that if on remand here, the district court finds that the material misstatements in the March 29 and April 23 Warrant affidavits were made with intent to deceive or mislead or with reckless disregard for the truth, then the challenged evidence should have been suppressed, and the district court must consider whether its admission of such evidence at trial requires vacatur of Molina's conviction or is harmless so as to allow the conviction to stand. If, however, the district court finds that the material misstatements were not made with deceitful or misleading intent or reckless disregard for the truth, but resulted from negligence, carelessness, or simple mistake, then no suppression was required, and Molina's conviction (at least on Counts I, II, IV, and V, the robbery counts) can stand undisturbed.

## II.  Challenged Jury Instruction

We turn now to Molina's jury charge challenge to his conviction on Counts III and VI, the firearms charges. "We review de novo a properly preserved challenge to a jury instruction, reversing where the charge, viewed as a whole, either failed to inform the jury adequately of the law or misled the jury about the correct legal rule," *United States v. Raniere*, 55 F.4th 354, 362 (2d Cir. 2022) (quoting *United States v. Capers*, 20 F.4th 105, 116 (2d Cir. 2021)), thereby prejudicing the defense, *see United States v. Hoskins*, 44 F.4th 140, 154 (2d Cir. 2022) (explaining reversal warranted only where charging error is "prejudicial" (internal quotation marks omitted)).

Molina argues that the district court's refusal (1) to include his requested instruction that "a pellet gun, imitation, facsimile or toy gun does not constitute a firearm" and (2) to omit the instruction that "a gun is a firearm" misled the jury about the correct legal rule because, as this court has explained, "not all guns are firearms." *United States v. Rosa*, 507 F.3d at 145 n.1 ("BB guns and staple guns, for

example, are not [firearms]" within definition applicable to § 924(c) offenses); *see* Appellant Br. 50–58.  Molina contends that this instruction was misleading in "equating all guns with firearms," thereby undermining his defense that the "gun" used in the commission of the subject robberies was not a "firearm" for purposes of the charged crime.  Appellant Br. 57.

Our decision in *Rosa* supports Molina's argument.  To be sure, the district court here correctly charged the jury, consistent with the statutory definition, that a firearm "means any weapon, which will or is designed to or may readily be converted to expel a projectile by the action of an explosive."  Trial Tr. 553; *see* 18 U.S.C. § 921(a)(3) (providing this definition).  But in concluding its instructions with the statement, "I instruct you that a gun is a firearm," Trial Tr. 554, the district court injected confusion insofar as a juror might have understood the court to be stating that if the weapon were a "gun" it necessarily satisfied the statutory definition of firearm.  After *Rosa*, this court has summarily identified error in an instruction that "a gun is a firearm" even when coupled with the statutory definition of "firearm."  *See United States v. Cedeño*, 437 F. App'x 8, 12 (2d Cir. 2011). We do the same in this published opinion.

In urging against vacatur, the government argues that the charging error was harmless because compelling evidence demonstrated that the guns brandished during the New Milford and Mahopac Robberies were firearms under the charged statute.  The argument fails to persuade.  No gun brandished during the New Milford or Mahopac Robberies was ever recovered.  Thus, there was no opportunity for the jurors to see the guns at issue or for any expert testimony supporting their identification as firearms. Such expert evidence was not required to convict.  Further, the jury was entitled to rely on eyewitness victim testimony about the guns brandished at them during the robbery.  But the issue here is not the sufficiency of the evidence adduced to support conviction.   It is the harmlessness of the charging error. Through cross-examination, Molina was able

to develop some evidence suggesting that the weapons used in the robberies were pellet guns or guns otherwise not qualifying as firearms. *See supra* at 15–16. It is on this record that the instruction that "a gun is a firearm" caused confusion, precluding a confident conclusion that, absent the erroneous instruction, "the jury would have returned the same verdict beyond a reasonable doubt." *United States v. Gomez*, 580 F.3d 94, 101 (2d Cir. 2009) (discussing harmless charging error).

Accordingly, we vacate Molina's convictions on Counts III and VI, and remand for further proceedings as to those counts, including possible retrial with correct jury instructions.[15]

## CONCLUSION

To summarize:

1.  Molina's motion to suppress evidence should not have been denied on the ground of inevitable discovery because the government has not shown that it would inevitably have discovered the evidence in question had Molina never challenged its warrant affidavits.

2.  Acknowledged misstatements in the challenged warrant affidavits were material to the issuing magistrate judges' findings of probable cause because, when we correct the affidavits to delete the misstatements, the facts remaining do not state probable cause sufficient to support the warrants obtained.

3.  Because the misstatements were material and because inevitable discovery does not apply, the district court was required to conduct a *Franks* hearing to determine the state of mind with which the misstatements were made, suppressing evidence if the misstatements

---

[15] Because we conclude that the district court's instruction that "a gun is a firearm" requires vacatur, we do not opine on whether Molina was entitled to the jury instruction he specifically requested.

were made with intent to deceive or mislead or with reckless disregard for the truth, or denying suppression if the misstatements were made negligently, carelessly, or through simple mistake. Remand for such a hearing is required with the district court directed to maintain or vacate Molina's conviction on Counts I, II, IV, and V (the robbery counts) depending on its findings.

4. The district court erred in instructing the jury that "a gun is a firearm," and because we cannot conclude that the error was harmless, we vacate Molina's conviction on Counts III and VI (the firearms counts) and remand for further proceedings, including possible retrial on correct instructions.

Accordingly, and for the reasons stated in this opinion, we **VACATE** the district court's September 25, 2020 order denying Molina's motion to suppress evidence obtained through the defective March 29 and April 23 Warrants on the ground of inevitable discovery; and we **REMAND** pursuant to *United States v. Jacobson*, 15 F.3d 19 (2d Cir. 1994), for the district court's further consideration of that motion consistent with *Franks v. Delaware*, 438 U.S. 154 (1978), and its determination whether to vacate or maintain Molina's October 12, 2021 judgment of conviction on Counts I, II, IV, and V (the robbery counts) consistent with this opinion. We further **VACATE** Molina's October 12, 2021 judgment of conviction on Counts III and VI (the firearms counts); and we **REMAND** for further proceedings consistent with this opinion, including possible retrial on proper jury instructions. Any further appeal in this case shall be assigned to this panel.